**Opinion issued May 14, 2013**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-12-00563-CV

———————————

**BRIAN SHANKLIN AND TODD RIMMER, Appellants**

**V.**

**BASSOE OFFSHORE (USA) INC., MIKE SMITH, AND JONATHAN FAIRBANKS, Appellees**

---

**On Appeal from the 127th District Court**
**Harris County, Texas**
**Trial Court Case No. 2009-14340**

---

### O P I N I O N

Appellants, Brian Shanklin and Todd Rimmer, challenge the trial court's

partial summary judgment rendered against them in their suit against appellees,

Bassoe Offshore (USA) Inc. ("Bassoe"), Mike Smith, and Jonathan Fairbanks, for

breach of contract, fraud, breach of fiduciary duty, misappropriation of trade secrets, tortious interference, and violations of the Texas Real Estate License Act ("RELA").[1]  In three issues, Shanklin and Rimmer contend that the trial court erred in granting Bassoe partial summary judgment on their RELA claim on the ground that they did not have standing to assert the claim.

We affirm.

## Background

In their second amended petition, Shanklin and Rimmer allege that in April 2006, Shanklin received a presentation from Pride International ("Pride"), wherein Pride announced that it would be willing to sell certain "operational and idle offshore rigs in the United States Gulf of Mexico, although Pride was not actively marketing those assets."  Shanklin and Rimmer were interested in the assets and through October 2006 conducted due diligence on Pride's rigs, consisting of "12 platform drilling and workover rigs and related equipment."   Shanklin and Rimmer intended to form a new company, Contender Offshore Services ("Contender"), and to raise "up to $60 million in capital" to acquire Pride's rigs in the Gulf of Mexico.

Shanklin and Rimmer contacted Bassoe representatives Fairbanks and Smith regarding whether they would be able to assist in their negotiations with Pride.

---

[1]     *See* TEX. OCC. CODE ANN. §§ 1101.01–1101.806 (Vernon 2012).

Fairbanks and Smith represented that Bassoe was "interested in [the] engagement," and they agreed that any information shared with them by Shanklin and Rimmer "would be held in the strictest of confidence." Eventually, Bassoe represented that it was willing to raise the capital for the purchase and expected a broker's fee of two to three percent of the total transaction price, but Bassoe requested an equity position in Contender and a seat on Contender's board of directors. Shanklin and Rimmer reached an agreement with Bassoe to "pursue the acquisition on an exclusive basis." Thus, Shanklin and Rimmer "terminated their discussions with other investment bankers and lenders and dealt exclusively with Bassoe."

In late January 2007, Smith notified Pride's director of business planning, Chris Weber, that Bassoe was interested in purchasing the Gulf of Mexico rigs. From February 14 to February 19, 2007, Smith collaborated with Shanklin and Rimmer to prepare an offer to Pride, but on February 22, 2007, Smith informed Shanklin and Rimmer that Weber was "busier than before" and "did not expect the negotiations to go rapidly." From March to September 2007, Smith repeatedly told Shanklin that "he had communicated the Contender proposals to Pride's representatives" but "Pride was busy on unrelated deals," causing delays in the negotiation. However, in early September, Shanklin asked Smith several times about a rumor that Pride was considering an offer from a third party, Blake International, but Smith did not respond.

3

On May 27, 2008, Pride completed the sale of the Gulf of Mexico rigs to Blake International. During a deposition, one of Bassoe's lawyers admitted that Bassoe had acted as a broker for Blake International in its transaction with Pride. Shanklin and Rimmer asserted that Bassoe, "while purporting to represent" them, "was actively promoting an acquisition proposal for the same Pride assets on behalf of one or more other clients, ultimately doing so on behalf of Blake International." They further asserted that Bassoe "affirmatively represented that Pride was too busy" to negotiate so as to "induce" Shanklin and Rimmer "not to pursue negotiations with Pride independently."

Shanklin and Rimmer brought several breach-of-contract and fraud claims, in addition to a claim under RELA. Specifically regarding their claim under RELA, Shanklin and Rimmer assert that "Bassoe, Smith, and/or Fairbanks acted as brokers in connection with their engagement." They also assert that Fairbanks, the president of Bassoe at the time of the negotiations, "admitted that neither Bassoe nor any of its principles were licensed brokers in Texas," but that Bassoe "acted as a broker in a transaction that involved real estate." *See* TEX. OCC. CODE ANN. § 1101.754(a) (Vernon 2012). They specifically seek "an amount of not less than $1,320,000.00 and not more than $3,960,000" for the violation of RELA.

In their summary-judgment motion, Bassoe, Smith, and Fairbanks asserted that from 2006 to 2007, they presented Shanklin and Rimmer's proposals to Pride

4

for the purchase of the Gulf of Mexico rigs.  On February 20, 2007, Bassoe presented an offer to Pride, but the offer "expired by its own terms" on February 28, 2008.  Pride also "confirmed it did not wish to sell rigs" to Shanklin and Rimmer.  Bassoe presented Pride an offer from Blake International six months later, which was eventually accepted, and Bassoe received a commission of two percent of the transaction price.  Bassoe, Smith, and Fairbanks argued that Shanklin and Rimmer's claims for fraud lacked merit because any obligations to Shanklin and Rimmer expired along with the final bid, no evidence existed of a fiduciary relationship, Bassoe provided no valuable services, Bassoe did not reveal any confidential information, and Shanklin and Rimmer's proposed damages "amount[] to nothing more than rank speculation."  Specifically regarding their claim under RELA, Bassoe argued:

> (f)    Plaintiffs lack standing to assert a private claim under the Texas Real Estate Licensing Act.  Plaintiffs are not "aggrieved parties" within the meaning of the Act because Plaintiffs cannot establish that **they** ever paid Bassoe any commission or consideration for their services, as required under the act[.]

In their response to Bassoe's summary-judgment motion, Shanklin and Rimmer asserted that they presented evidence precluding summary judgment on their claims for breach of contract, fraud, breach of fiduciary duty, tortious interference, and misappropriation of trade secrets.  Regarding their claim under RELA, Shanklin and Rimmer asserted that Bassoe, through Smith and Fairbanks,

5

acted as their brokers despite the fact that Smith and Fairbanks were not licensed brokers in Texas. Shanklin and Rimmer attached to their motion the depositions of Smith and Fairbanks, wherein both testified that they were not licensed as real estate brokers.

After a hearing, the trial court granted Bassoe summary judgment on Shanklin and Rimmer's claim for fraudulent inducement and its claim under RELA, but it denied Bassoe summary judgment on the remaining claims. The trial court then conducted a bench trial on Shanklin and Rimmer's remaining claims, and it ordered that they recover $2000 from Bassoe. After Shanklin and Rimmer asked the trial court to make findings of fact and conclusions of law, the trial court made its findings and conclusions and later signed an amended final judgment, ordering that Shanklin and Rimmer take nothing from Bassoe. The trial court found that:

12. Shanklin spent a considerable amount of time developing a Memorandum outlining a plan to acquire the rigs, to create the management team, and to create the financial projections. This Memorandum was shared with various individuals. None of the individuals who received this Memorandum were asked to sign a Non-Disclosure Agreement or were explicitly asked to keep this information confidential.

. . .

21. [Bassoe] presented two offers on behalf of Shanklin and Rimmer, under the name Newco, dated February 15, 2007, and February 20, 2007, respectively.

6

22.    Shanklin and Rimmer did not have the money or financing to close the deal with Pride at the time of the February 20, 2007, offer.

23.    The February 20, 2007, offer was never accepted and expired on or about the end of February 2007.  No further offers were made on the Pride Assets by Shanklin and Rimmer.

24.    Shanklin and Rimmer never made another offer, and Pride never tendered a counter-offer.

25.    Shanklin and Rimmer's entire business plan was predicated on the acquisition of the Pride Assets.

26.    After the expiration of the offer, Smith, Fairbanks, and Bassoe began working with other interested purchasers of Pride's assets.

27.    Shanklin and Rimmer remained in communication with Smith, Fairbanks, and Bassoe regarding their expired offer.

28.    In July, Bassoe began negotiating with Pride on behalf of Michael Blake for the same platform rigs sought by [Shanklin and Rimmer].  Fairbanks and Blake had a long relationship.

29.    Smith's handwritten notes around the time of these discussions (Exhibit 65) clearly establish that he knew exactly what Pride wanted from [Shanklin and Rimmer] from day one: "Finances in place."

30.    The notes also reflect that Smith was clearly aware of [Shanklin and Rimmer's] continued interest in the Pride assets.

       . . .

35.    Blake closed the transaction and acquired the 12 platform rigs and related assets for $66 million in May 2008.

36.    Bassoe, Smith and Fairbanks received a commission of $1.32 million on the sale.

. . .

38.    A relationship existed between Shanklin and Rimmer, on the one hand, and Bassoe, Fairbanks and Smith, on the other hand. This relationship began early November 2006, or at the very latest February 15, 2007, and continued until February 28, 2007.

39.    Shanklin and Rimmer did not calculate their lost profits with reasonable certainty.

40.    A preponderance of the evidence does not support the allegation that Shanklin and Rimmer could have or would have concluded their purchases of the Pride assets.

41.    Shanklin and Rimmer's business model was predicated on obtaining the financing/money for the project after Pride committed to Shanklin and Rimmer. Pride was not going to approach the sale in this manner.

The trial court concluded that:

1.    The duties that existed between [Shanklin and Rimmer] and Bassoe in this case failed to exist after the expiration of [Shanklin and Rimmer's] February 20, 2007, offer to Pride.

2.    Further, [Shanklin and Rimmer's] damage model was too speculative.

### Standard of Review

To prevail on a summary-judgment motion, a movant has the burden of proving that it is entitled to judgment as a matter of law and there is no genuine issue of material fact. TEX. R. CIV. P. 166a(c); *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995). When a defendant moves for summary judgment, it must either

8

(1) disprove at least one essential element of the plaintiff's cause of action or (2) plead and conclusively establish each essential element of its affirmative defense, thereby defeating the plaintiff's cause of action. *Cathey*, 900 S.W.2d at 341. When deciding whether there is a disputed, material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex. 1985). Every reasonable inference must be indulged in favor of the non-movant and any doubts must be resolved in his favor. *Id.* at 549.

To prevail on a no-evidence summary-judgment motion, a movant must allege that there is no evidence of an essential element of the adverse party's cause of action or affirmative defense. TEX. R. CIV. P. 166a(i); *Fort Worth Osteopathic Hosp., Inc. v. Reese*, 148 S.W.3d 94, 99 (Tex. 2004). We review a no-evidence summary judgment under the same legal-sufficiency standard used to review a directed verdict. *Gen. Mills Rests., Inc. v. Tex. Wings, Inc.*, 12 S.W.3d 827, 832–33 (Tex. App.—Dallas 2000, no pet.). Although the non-movant is not required to marshal his proof, he must present evidence that raises a genuine issue of material fact on each of the challenged elements. TEX. R. CIV. P. 166a(i); *see Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). A no-evidence summary-judgment motion may not be granted if the non-movant brings forth more than a scintilla of evidence to raise a genuine issue of material fact on the challenged

9

elements. *See Ridgway*, 135 S.W.3d at 600. More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). When reviewing a no-evidence summary-judgment motion, we assume that all evidence favorable to the non-movant is true and indulge every reasonable inference and resolve all doubts in favor of the non-movant. *Spradlin v. State*, 100 S.W.3d 372, 377 (Tex. App.—Houston [1st Dist.] 2002, no pet.).

## Standing

In three issues, Shanklin and Rimmer contend that the trial court erred in granting Bassoe summary judgment on their RELA claim because they did have standing to pursue a private cause of action under RELA as an "aggrieved party." *See* TEX. OCC. CODE ANN. § 1101.754 (Vernon 2012).

Standing focuses on the question of who may bring an action. *See Patterson v. Planned Parenthood of Houston and Southeast Tex., Inc.*, 971 S.W.2d 439, 442 (Tex. 1998). Standing is a component of subject-matter jurisdiction, and subject-matter jurisdiction is essential to the authority of a court to decide a case. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443 (Tex. 1993); *see also DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 304 (Tex. 2008) ("A court has no jurisdiction over a claim made by a plaintiff without standing to assert it."). We

10

review standing under the same standard by which we review subject-matter jurisdiction generally. *Tex. Air Control Bd.*, 852 S.W.2d at 446. Whether the trial court has subject-matter jurisdiction is a question of law that we review de novo. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004).

We review the trial court's interpretation of a statute de novo. *See Johnson v. City of Fort Worth*, 774 S.W.2d 653, 655–56 (Tex. 1989). In construing a statute, our objective is to determine and give effect to the Legislature's intent. *See Nat'l Liab. & Fire Ins. Co. v. Allen*, 15 S.W.3d 525, 527 (Tex. 2000).

RELA defines a "broker" as "a person who, in exchange for a commission or other valuable consideration . . . negotiates or attempts to negotiate the listing, sale, exchange, purchase or lease of real estate[.]" TEX. OCC. CODE ANN. § 1101.002(1)(A)(iii) (Vernon 2012). Unless a person holds a license issued under RELA, the person may not "act as or represent that the person is a broker or salesperson." *Id.* § 1101.351(a) (Vernon 2012). The statute provides for a private cause of action for certain violations by a broker as follows:

(a) A person who receives a commission or other consideration as a result of acting as a broker or salesperson without holding a license or certificate of registration under this chapter is liable to an aggrieved person for a penalty of not less than the amount of money received or more than three times the amount of money received.

(b) The aggrieved person may file suit to recover a penalty under this section.

*Id.* § 1101.754. The statute does not provide a definition of an "aggrieved person."

The Tenth Court of Appeals addressed the issue of who qualifies as an "aggrieved person" under a predecessor statute in *Holloman v. Denson*, 640 S.W.2d 417 (Tex. App.—Waco 1982, writ ref'd n.r.e.). In *Holloman*, Joe and Bobbie Denson contacted Holloman for assistance in purchasing a home. *Id.* at 419. Holloman then arranged for the Densons to purchase a home, but after the sale was made, the Densons opted to buy a home owned by Behringer instead. *Id.* The Densons agreed to purchase Behringer's home as well and then sell the home they had previously purchased. *Id.* Holloman acted as broker both for Behringer in his sale to the Densons and for the Densons in their subsequent sale of the first house, receiving a commission for both sales. *Id.* The Densons sought to recover the commissions paid for both sales. *Id.*

The Densons sued under a predecessor statute to section 1101.754, which stated that a person who acted as a real estate agent without first obtaining a license and collected a commission was liable for a penalty up to three times the amount of the commission, "which penalty may be recovered . . . by an aggrieved person." *Id.* at 419–20. The court held that the Densons were not aggrieved persons as to the sale of the Behringer home because the Densons did not pay Holloman that commission. *Id.* at 420. However, the court further held that the Densons were aggrieved persons as to the commission they paid Holloman for the sale of their

12

home, regardless of whether Holloman's actual services were deficient. *Id.* The court explained:

> A person hiring a real estate agent is seeking to employ services of an expert who has been tested and found to be such, and, if unknown to him, he gets a person who has not been tested and found to be an expert, but is charged the full commission rate, that person has suffered a loss since he did not get what he was paying for.

*Id.*; *see also Ragnell v. Town of Addison*, No. Civ.A.3:03-CV-0379-K, 2004 WL 345491, at *3 (N.D. Tex. Feb. 24, 2004) (relying on *Holloman* and dismissing plaintiff's claims under same statute because plaintiff "did not pay any of the alleged illegal commissions").

More recently, the Fourteenth Court of Appeals addressed a similar issue with respect to mortgage brokers in *Dohalick v. Moody National Bank*, 375 S.W.3d 537 (Tex. App.—Houston 2012, no pet.). In *Dohalick*, the defendant, Jerry Dohalick, contacted the plaintiff, Moody National Bank, in order to procure financing for Savoy Custom Homes ("Savoy"), a business that constructed houses. *Id.* at 538–39. Dohalick ultimately procured the loans, but he allegedly gave the bank several false and misleading statements in the process. *Id.* at 539. Dohalick also allegedly engaged in check kiting with Savoy's checking account with the bank. *Id.*

The bank brought several claims of fraud against Dohalick, in addition to a private cause of action under the Texas Finance Code, which provides,

13

> A person who received money, or the equivalent of money, as a fee or profit because of or in consequence of the person acting as a mortgage broker or loan officer without an active license . . . is liable for damages in an amount that is not less than the amount of the fee or profit received and not to exceed three times the amount of the fee or profit received . . . .  An aggrieved person may recover damages under this subsection.

*Id.* at 540–41 (citing Act of May 25, 1999, 76th Leg., R.S., ch. 1254, § 2, 1999 Tex. Gen. Laws 4334, 4346 (current version at TEX. FIN. CODE ANN. § 156.406(b) (Vernon 2012)).  The court noted that, under the statute, an aggrieved person's liability was calculated based on the commission the mortgage broker received "because of or in consequence" of the person acting as a mortgage broker without a license.  *Id.* at 541.  Relying in part on *Holloman*, the court concluded that an "aggrieved person" under the statute "must have paid all or part of the fee or profit to the unlicensed mortgage broker or loan officer."  *Id.* at 541–42.

Here, it is undisputed that Shanklin and Rimmer did not pay Bassoe any commission from the sale of the Pride oil rigs; rather, they seek only the commission paid to Bassoe by Blake International for its purchase of the rigs.  Relying on *Holloman* and *Dohalick*, Bassoe argues that a plaintiff must have paid a defendant their commission to have standing to recover a commission as an "aggrieved person" and pursue a private cause of action under section 1101.745.

We agree.  The statute penalizes a person for receiving a commission "as a result of" acting as a broker without holding a license.  TEX. OCC. CODE ANN.

14

§ 1101.754(a). And an aggrieved person can recover a penalty from the person in an amount up to three times the amount of the money received by the person. *Id.* Thus, the penalty the aggrieved person can recover is based upon the commission received by the person. Because a claimant is aggrieved by the specific conduct of the person receiving a commission without having a license, we conclude that the aggrieved person must have paid that commission to have standing to pursue a private cause of action under RELA. *See Dohalick*, 375 S.W.3d at 541–42 (reaching same conclusion under Texas Finance Code); *Holloman*, 640 S.W.2d at 420 ("[T]here is no way the Densons could be found to be the aggrieved persons where the commission was paid by Behringer to Holloman[.] Behringer is the aggrieved person."). This comports with the apparent purpose of section 1101.745 to protect those who, "seeking to employ [the] services of an expert," have paid a full commission, but not received the services of a licensed expert. *See Holloman*, 640 S.W.2d at 420.

Shanklin and Rimmer attempt to distinguish *Dohalick*, arguing that, under section 1101.745, an aggrieved person is entitled to recover a "penalty," while the statute at issue in *Dohalick* provided that an aggrieved person be entitled to recover "damages." Regardless, under section 1101.745, the statute awards a penalty only to those "aggrieved" due to the payment of a commission to a person without a license.

15

Finally, Shanklin and Rimmer argue that Fairbanks and Smith are liable under RELA because they are fiduciaries under Texas law. *See Fed. Deposit Ins. Corp. v. Golden Imports, Inc.*, 859 S.W.2d 635, 643–44 (Tex. App.—Houston [1st Dist.] 1993, no pet.). However, Shanklin and Rimmer have already brought a common law claim for breach of fiduciary duty, and this claim was fully litigated in a bench trial after partial summary judgment was granted on their RELA claim. After the bench trial, the trial court ordered that Shanklin and Rimmer take nothing on their claim for breach of a fiduciary duty. Thus, any error in granting Bassoe partial summary judgment because of its status as a fiduciary is rendered harmless by the trial court's subsequent findings. *See Progressive County Mut. Ins. Co. v. Boyd*, 177 S.W.3d 919, 921 (Tex. 2005) (Tex. 2005) (holding that trial court's error in granting defendants summary judgment without notice to plaintiff was rendered harmless by subsequent jury findings that negated plaintiff's claims); *Quality Infusion Health Care, Inc. v. Health Care Serv. Corp.*, 224 S.W.3d 369, 389 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (holding that any error in granting summary judgment on tort claims rendered harmless by trial court's findings, after a bench trial, that negated the claims). The trial court's bench findings preclude reversal of the partial summary judgment on that basis.

We conclude that Shanklin and Rimmer were not "aggrieved persons" under section 1101.754 and, thus, did not have standing to bring a private cause of action

under the statute.  And even if the trial court erred in concluding that Shanklin and Rimmer lacked standing, its subsequent findings after a bench trial preclude a reversal of the partial summary judgment.  Accordingly, we hold that the trial court did not err in granting Bassoe, Smith, and Fairbanks summary judgment on Shanklin and Rimmer's RELA claim.

We overrule Shanklin and Rimmer's first, second, and third issues.

## Conclusion

We affirm the judgment of the trial court.


Terry Jennings
Justice

Panel consists of Justices Jennings, Bland, and Massengale.

Justice Massengale, concurring.