

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-13-00076-CV

_____

VIRGINIA OAK VENTURE, LLC, AND JANE TANG, Appellants

V.

O.D. FOUGHT, JR., ET AL., Appellees

On Appeal from the 401st District Court
Collin County, Texas
Trial Court No. 401-02380-2010

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Moseley

# O P I N I O N

Jane Tang and her company, Virginia Oak Venture, LLC,[1] brought suit against a slue of defendants either whom they allege participated in the selling to them of a McKinney, Texas,[2] apartment complex for an amount far in excess of its value or whom Tang believed played a role in the financing of that purchase.

Tang appeals from a series of partial summary judgments in favor of some of the defendants, followed by a jury trial against the remaining defendants—all of which ultimately resulted in the rendition of a take-nothing judgment against her.

According to her expert appraisers at trial, Tang paid much more than the actual value of the apartment complex at the time of its purchase. To compound her damage, the housing market cratered shortly after her purchase, and the value of the property was greatly diminished even from its value at the time of the purchase. Tang alleged that the defendants severely over-represented the cash flow expected to be derived from the apartments and that the sellers misrepresented the extent of repairs that had been made to the apartment complex. Tang contends that she was defrauded by a real estate salesman and the prior owners and that they violated their duty to treat her fairly and reveal all the relevant, unvarnished truth to her. Tang contends that the appraiser, Lander Kyle Lewallen, and the originating lender, Arbor Commercial Funding, LLC, acted together to ensure that she could obtain a loan for substantially

---

[1]Hereinafter, reference to Tang includes her business entity as well, except as otherwise indicated.

[2]Originally appealed to the Fifth Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001 (West 2013). We are unaware of any conflict between precedent of the Fifth Court of Appeals and that of this Court on any relevant issue. *See* TEX. R. APP. P. 41.3

more than the value of the property, thereby abetting in the scam that she alleged the sellers perpetrated on her. She also maintains that when the Federal National Mortgage Association (Fannie Mae or FNMA) purchased her loan from Arbor, it did so in violation of its own requirements and that had it been willing to do so, it would have thrown the entire process off the tracks, preventing her from purchasing the property at the price she paid. What is ultimately clear is that almost everyone involved in the transaction realized a profit from the sale and financing except for Tang (and FNMA). Her business entity, Virginia Oak Venture, LLC (Virginia Oak), filed bankruptcy.[3]

## I.    PARTIES

The defendants in the lawsuit were O. D. Fought, Jr. (the real estate salesman/agent), the Michael Group (Fought's real estate broker under whose license he operated), Sheri Diaz (Fought's daughter, who was also manager of the apartment complex), Lander Kyle Lewallen (a real estate appraiser), Butler Burgher Group, LLC (Lewallen's employer), United Venture Partners, LLC (the seller of the apartment complex, to which reference is made hereafter as UVP), Chris Wong, Raymond He, Joyce He, and Biyou Lao (the principals of United Venture Partners, LLC, to whom reference is made collectively as "Wong"), Arbor Commercial Funding, LLC (the originating lender), and the Federal National Mortgage Association (to which the

---

[3]We make the comments in this footnote out of the record. The context and timing of the transaction the subject of this suit explains much. At the time these actions occurred, the nation appears to have been in what has been characterized as a real estate bubble, during which institutions that originated loans on real estate were apparently often giving only the most cursory examination to loan applications or appraisals and with little assurance that the loans would actually be repaid, knowing that the loans could be sold on the market without recourse and that there was good profit to be made in originating these loans. This worked for some years because of the skyrocketing resale value of real estate and the propensity of borrowers to speculate on continued inflation of real estate prices. Ultimately, this house of cards came tumbling down, and the taxpayers were forced to prop up the ultimate holders of many of these mortgage-secured notes. This case appears to involve something of a microcosm of that behavior.

promissory note was ultimately assigned and to which reference is made as FNMA or Fannie Mae).

Fannie Mae, Arbor Commercial Funding, LLC, Lander Kyle Lewallen, Butler Burgher Group, LLC, and the Michael Group each moved for (and were each granted) summary judgment, extinguishing Tang's claims against them. Fought and Diaz both appeared pro se and participated in the jury trial, and Diaz filed a brief on appeal. Although UVP, Chris Wong, Raymond He, Joyce He, and Biyou Lao each filed pro se answers, none of them made a personal appearance at trial, and none has filed a brief on appeal. Nonetheless, the jury ruled in favor of all of the remaining defendants at trial, and Tang was not awarded any recovery against anyone.

Tang appeals both the summary judgments awarded[4] and the jury verdict rendered against her, arguing that the jury verdict rendered was against the great weight and preponderance of the evidence.

## II.    SUMMARY JUDGMENT DISPOSITIONS

Here, we will deal with the various summary judgments rendered on behalf of various defendants. Tang contends that the trial court erred by granting summary judgment for the Michael Group, Lewallen, and Butler Burgher Group (collectively, the appraiser), and Arbor Commercial Funding. She also argues that even if summary judgment had been proper, the trial court's award of appellate attorney fees to Arbor was improper.

A traditional motion for summary judgment is granted only when the movant establishes that there are no genuine issues of material fact and it is entitled to judgment as a matter of law.

[4]Almost all of Tang's brief deals with the grant of summary judgments, very little of it dealing with the results of the jury trial. There were no issues raised on appeal as to the summary judgment in favor of Fannie Mae.

4

*Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We review the grant or denial of summary judgment de novo and, in doing so, we consider the summary judgment evidence in the light most favorable to the nonmovant. *Craig Sessions, M.D., P.A. v. TH Healthcare, Ltd.*, 412 S.W.3d 738, 742 (Tex. App.—Texarkana 2013, no pet.).

A no-evidence summary judgment is essentially a pretrial directed verdict. Therefore, we apply the same legal sufficiency standard in reviewing a no-evidence summary judgment as we apply in reviewing a directed verdict. *Wal-Mart Stores, Inc. v. Rodriguez*, 92 S.W.3d 502, 506 (Tex. 2002). We must determine whether the plaintiff produced any evidence of probative force to raise a fact issue on the material questions presented. *See id.*; *Woodruff v. Wright*, 51 S.W.3d 727, 734 (Tex. App.—Texarkana 2001, pet. denied). The plaintiff will defeat a defendant's no-evidence summary judgment motion if plaintiff presented more than a scintilla of probative evidence on each element of its claim. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003); *Rhine v. Priority One Ins. Co.*, 411 S.W.3d 651, 657 (Tex. App.—Texarkana 2013, no pet.).

### A. Summary Judgment in Favor of the Appraiser

Tang contends that the court erred by rendering summary judgment in favor of the appraiser because she maintains that (1) the appraisal given by the appraiser to Arbor, the lender, was a statement of fact rather than just an opinion; (2) the appraiser either knew or should have known the appraisal would be relied on by both the lender and the purchaser; (3) there was evidence that the appraisal was based on false information about the property; and (4) there was evidence showing that the draft appraisal's deviations from the Uniform Standards of

5

Professional Appraisal Practices (USPAP) were so "glaringly obvious" that a finder of fact could have inferred that a certified appraiser either knew the value was false or was reckless or negligent in rendering the evaluation. The document that was provided by the appraiser and to which Tang refers contains the following statement:

> DISCLAIMER: The Borrower hereby acknowledges and agrees that Arbor does not warrant or guarantee the accuracy, completeness or usefulness of any information, report or appraisal or any of the contents contained therein provided by Arbor by any third party (the "Third Party Information"), and Borrower shall not rely on such Third Party Information for any purpose in connection with the loan.

Tang maintains that this disclaimer was not effective because the public should be allowed to rely on such appraisals, irrespective of such disclaimers.

Even should the trial court have found that the disclaimer was ineffective against barring Tang's claim, one uncontestable fact remains: the appraiser never issued a final, signed appraisal to anyone. The appraisal to which Tang refers is stamped with very prominent letters on virtually every page "DRAFT." Even as a draft, it specifically provides that it was prepared solely for the use of Arbor and FNMA and that no copy was to be disseminated to any other entity. Summary judgment evidence does not reflect how Tang obtained a copy. However, the record does show that she obtained a copy of the draft appraisal only after she had closed the purchase. Therefore, it was impossible for her to have relied upon the content of the appraisal in making the decision to purchase.

In an effort to circumvent this issue of post-closing disclosure, Tang asserts that the claims against the appraiser are not based solely on her personal reliance on the unfinished appraisal; rather, she says that she relied upon Arbor's reliance on the unfinished appraisal in

6

making the decision to purchase. Thus (she argues), the appraised value stated in the appraisal was a false statement of fact rather than the statement of an opinion; continuing in that vein, she maintains that the fact that the draft appraisal contained misrepresentations and misleading omissions caused her injury because it allowed the lender to loan her more money than was justifiable under the circumstances.[5]

The summary judgment evidence is extensive on both sides. It shows conclusively, however, that (1) Tang did not see a copy of the appraisal until some point after she had completed the purchase of the property, (2) the appraisal was prepared solely for the benefit of the lender and contained language designed to limit its distribution to only those in the position of a lender, and (3) the document involved was never a completed appraisal (which was both unsigned and stated prominently on its face in many places that it was only a preliminary draft of an appraisal).

The allegations by Tang against the appraiser are fraud, misrepresentation, and conspiracy.

The Texas Supreme Court recently reviewed the requisites of a fraud action, confirming that the Restatement definition applies. Specifically,

> One who makes a fraudulent misrepresentation is subject to liability to the persons or class of persons whom he intends or has reason to expect to act or to refrain from action in reliance upon the misrepresentation, for pecuniary loss suffered by them through their justifiable reliance in the type of transaction in which [he] intends or has reason to expect their conduct to be influenced.

---

[5]Tang also testified that Fought had told her that she could rely on the appraiser and lender to verify the condition and value of the property and that the lender would refuse to loan the remainder of the purchase price if the value of the property was insufficient to secure the loan.

*Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 922 n.14 (Tex. 2010) (citing RESTATEMENT (SECOND) OF TORTS § 531).

The court also recognized that both fraud and negligent misrepresentation require that the plaintiff show actual and justifiable reliance.[6]  *Id.* at 923.  Under the summary judgment evidence, there is no evidence that Tang actually relied on the appraisal—by the time she saw it, the purchase had already been completed.  Her argument is that she relied upon the lenders' reliance upon the appraiser.  Stretching reliance through another party in that fashion is not supported by the law, and Tang has provided us with no examples of situations where such extended reliance was found appropriate.  Even if the evidence was read to provide actual reliance, under the facts as set out above, there is no evidence that would support the position that the reliance was justifiable.

Tang also suggests that her reliance on the appraisal was the result of an express clause in the contract, pointing specifically to the following sentence in a special provisions section of the purchase agreement:  "Property must appraise for purchase price or buyer can cancel contract with no pen[a]lty."

Neither of these arguments is persuasive.  The cited evidence does not provide proof that she actually relied on the appraisal in making her decision to purchase the property.  Evidence

---

[6]In *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010), the court recognized that in measuring justifiability, we must inquire whether, "given a fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud[,] it is extremely unlikely that there is actual reliance on the plaintiff's part." *Haralson v. E.F. Hutton Grp., Inc.*, 919 F.2d 1014, 1026 (5th Cir. 1990) (applying Texas law).  Moreover, "a person may not justifiably rely on a representation if 'there are "red flags" indicating such reliance is unwarranted.'" *Lewis v. Bank of Am. NA*, 343 F.3d 540, 546 (5th Cir. 2003) (quoting *In re Mercer*, 246 F.3d 391, 418 (5th Cir.2001) (holding plaintiff's decision to enter into transaction without undertaking additional investigation into tax consequences not justifiable, given his access to professional accountants, amount of money involved, and ambiguous nature of pertinent representation)).

that Fought had told her that she was justified in relying on the reliance by the bank on an appraisal cannot be evidence that the appraiser had defrauded her—even if the appraiser had delivered a completed appraisal. Indeed, since it was never finalized, it would be difficult to say that the appraiser even legally misled or defrauded the lender because the appraiser never provided a completed, properly prepared, finished product to the lender. Even in that absence, the lender decided to proceed with the loan anyway.

Further, Virginia Oak committed to the purchase before any appraisal was prepared and also contractually disclaimed and waived any reliance on any representations by the lender (Arbor) and its appraisers.

There was never a full appraisal tendered, and even had there been one, Tang was in no position to rely on it. Her argument relies on the disjointed claim that because her bank was willing to rely on a quasi-appraisal in its decision to loan her $2.1 million to enable her to purchase the apartment complex, this amounted to a fraud by the appraiser on Tang upon which she was entitled to rely and actually did rely.

That particular argument was directly addressed by the Dallas Court of Appeals in *Greenlee Enterprises v. Compass Bank*, No. 05-10-00490-CV, 2011 Tex. App. LEXIS 9519 (Tex. App.—Dallas Dec. 5, 2011, no pet.) (mem. op.). In that case, a purchaser of a business also sued a lending bank and its appraiser claiming, among other things, that the purchaser relied on the appraisal through the lender's reliance. The Dallas court pointed out that (as in this case) the plaintiff did not review the appraisals before closing the purchase; thus, it could not have relied on them in agreeing to purchase. Thus, the Dallas court concluded that there was no

9

evidence to raise a fact issue about the contents of the appraisal or any reliance by purchaser and found summary judgment in favor of the appraiser to be proper. *Id.* at *24. Not only is this a sensible and accurate application of the law, we are obligated in this case to follow the rulings of the Dallas Court of Appeals, the transferor court. TEX. R. APP. P. 41.3. On this basis, we must affirm the summary judgment in favor of the appraiser.

### B. Summary Judgment in Favor of Arbor Financial

Tang seeks to recover against Arbor Financial under theories of civil conspiracy and under the Deceptive Trade Practices Act (DTPA). *See* TEX. BUS. & COM. CODE ANN. § 17.50 (West 2011).

"An actionable civil conspiracy is a combination by two or more persons to accomplish an unlawful purpose . . . by unlawful means." *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983).[7] Although a conspiracy may be proved by circumstantial evidence, the Dallas Court of Appeals has held that "'disconnected circumstances, any one of which, or all of which, are just as consistent with lawful purpose as with unlawful undertaking, are insufficient to establish conspiracy.'" *Greenlee*, 2011 Tex. App. LEXIS 9519, at *21 (quoting *First Interstate Bank of Tex., N.A. v. S.B.F.I., Inc.*, 830 S.W.2d 239, 249 (Tex. App.—Dallas 1992, no pet.) (citing *Hicks v. Wright*, 564 S.W.2d 785, 793 (Tex. Civ. App.—Tyler 1978, writ ref'd n.r.e.))). Here, Tang failed to provide evidence to circumvent this ruling.

---

[7]"The elements of a conspiracy are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or courses of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. A conspiracy requires a meeting of the minds on the object or course of action, and some mutual mental action coupled with an intent to commit the act which results in injury; there must be a preconceived plan and unity of design and purpose." *Ward v. Sinclair*, 804 S.W.2d 929, 931 (Tex. App.—Dallas 1990, writ denied) (citations omitted).

10

Summary judgment was therefore properly rendered in favor of all defendants (including Arbor) on the claims by Tang of a civil conspiracy because Tang simply presented no evidence that any such conspiracy existed. There was no evidence provided by Tang that every action taken by Arbor was not consistent with a lawful purpose, however incompetently Arbor's acts may have been performed. The inference that Tang drew from the actions of Arbor in consenting to loan her the money she requested as a loan was not an active representation upon which she was entitled to rely.

Tang also contends that the trial court's award of attorney fees to Arbor was improper. Arbor chose not to respond to this contention. The final judgment, which disposed of all parties and issues, states that it does so "[i]n accordance with" the various summary judgments and the jury verdict. The summary judgment directs that Arbor jointly and severally recover from plaintiffs' attorney fees of $5,000.00 for an appeal to the court of appeals and an additional $3,500.00 for an appeal to the Texas Supreme Court. It specifies no particular authority for the award.

Tang's argument is limited and is correct. She argues that she cannot personally be liable for paying attorney fees because the sole place that would authorize a recovery of attorney fees was the terms of the deed of trust. Tang was not a personal signatory of the deed of trust, and Arbor was no longer the beneficiary under the deed of trust—which had been assigned along with the note to FNMA. Those contentions both appear to be persuasive.

Although the argument is extraordinarily concise, we believe it reasonably can be read to argue both on behalf of Tang and Virginia Oaks that the award is improper. Arbor does not

11

attempt to support the award. Its motion for summary judgment seeks to recover attorney fees based on the provisions of the deed of trust. However, since it was no longer the holder of the lien and the beneficiary of the deed of trust (it having been previously assigned), it cannot avail itself of that relief. The award of attorney fees is reversed.

## C.      Summary Judgment in Favor of the Michael Group

Tang contends that the trial court erred by rendering summary judgment for the Michael Group, the broker under whose license Fought acted as a real estate salesperson. At oral argument, Tang took the position that since it had been necessary for Fought to place the issues before a jury, there must have been questions of fact for the jury to address. Tang does correctly observe that "[a] licensed broker is liable to the commission, the public, and the broker's clients for any conduct engaged in under this chapter by the broker or by a salesperson associated with or acting for the broker." TEX. OCC. CODE ANN. § 1101.803 (West 2012). As the statute shows, if Fought (a real estate salesperson acting under the broker's license of the Michael Group) were held actionably liable in his dealings with Tang, the Michael Group would be vicariously liable with Fought. *See Flutobo, Inc. v. Holloway*, 419 S.W.3d 622, 637 (Tex. App.—Houston [14th Dist.] 2013, pet. denied).

Although this bears some truth in many circumstances, this is something of an overly simplistic analysis. In this case, the Michael Group was represented by counsel, and Fought appeared pro se. Fought requested neither a summary judgment nor an instructed verdict. In some circumstances, someone in Fought's circumstance may have been able to avoid submitting fact issues to the trier of fact. Therefore, the fact that a jury made factual findings is not

12

determinative of whether it was improper to have granted the Michael Group's motion for summary judgment. The real issue here was whether fact questions remained unresolved. In this circumstance, there were. Because there were outstanding fact questions as to the representations made by Fought to Tang at the time that the Michael Group's motion for summary judgment was granted, it was error for the trial court to have granted that motion.

However, after Fought submitted the remaining questions of fact to the jury, the jury found in favor of Fought in all respects. Because the jury exculpated Fought from Tang's allegations, Fought was not liable to Tang. Because Fought was not liable to Tang, neither was the Michael Group.

Pursuant to the Rules under which we operate, we are instructed that "[n]o judgment may be reversed on appeal on the ground that the trial court made an error of law unless the court of appeals concludes that the error complained of . . . probably caused the rendition of an improper judgment . . . ." TEX. R. APP. P. 44.1. Here, the error of the trial court in granting the motion for summary judgment filed by the Michael Group was rendered harmless by the subsequent findings of the jury that Tang had not been harmed by Fought's actions as a real estate salesperson. We will not reverse for harmless error. *Progressive Cnty. Mut. Ins. Co. v. Boyd*, 177 S.W.3d 919, 921 (Tex. 2005) (per curiam); *Shanklin v. Bassoe Offshore (USA), Inc.*, 415 S.W.3d 311, 319–20 (Tex. App.—Houston [1st Dist.] 2013, pet. denied).

Therefore, if we affirm the jury's verdict as to Fought, we also affirm this summary judgment.

13

**III.    ISSUES PRESENTED TO THE JURY**

**A.    Claims Against O.D. Fought, Jr., Relating to Misrepresentations and Agency**

Tang contends that the jury's failure to find that Fought had committed actionable fraud against her was against the great weight and preponderance of the evidence.

When a party with the burden of proof attacks the legal sufficiency of an adverse jury finding, she must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam). In our review, we necessarily leave a jury's determination on conflicting evidence intact; it is the sole judge of credibility. *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005).

In her brief before this Court, Tang argues,

Fought grossly misrepresented the occupancy levels of the property, the income and expenses of the property, supplied false information to be used by the appraiser and the lender, and hid from the plaintiffs, appraiser and lender more accurate rent rolls, financial data, and most importantly, a sale of the property just ten months earlier at nearly half the price, all so that an inflated appraisal and inflated loan would result, and so the plaintiffs would rely on the information given them and on the loan and appraisal to close the purchase . . . .

Although she presents no evidence other than her personal conclusions to justify it, Tang initially attempts to set the playing field by arguing that Fought acted as both the agent for the seller and as agent for her as well. Although there was some behavior on Fought's part that could be construed to support such a conclusion, it could likewise be construed to simply have been Fought helping Tang in order to "grease the wheels" of the deal. Fought not only located an attorney to create the LLC to act as the purchasing entity, he agreed to be personally named as

14

Texas resident agent for service of process for the entity. Fought was extremely solicitous of Tang by acting as her chauffeur from the airport, personally taking her through each of the ten properties he was attempting to sell her, directing her to a particular lender, and preparing all the documents involved in the transaction. While one could believe that these activities, taken as a whole, might suggest the existence of a personal relationship, they may also be representative of a dedicated salesman tracking the spoor of a very healthy commission.

In addition to this conduct, there is also one document that Fought signed wherein he purported to act as her agent. However, he testified at trial that the document was one of many he signed during this transaction and that this particular signature was simply a mistake on his part. He testified that he was not Tang's agent, that no such agreement existed, and that he was working to sell the property on the seller's behalf, which necessarily included all of the contact with Tang necessary to carry through with that action.

The jury also had evidence before it that Fought was not an agent of Tang, therefore, having no fiduciary duty to Tang. The burden of proof was on Tang to prove that Fought represented himself to be acting as her agent, and the jury refused to rule in her favor. Under a great weight and preponderance analysis, Tang is required to conclusively prove her position in order to prevail on appeal when the trier of fact ruled against her. Tang failed to provide the requisite conclusive evidence that Fought acted as her agent, and there is contrary evidence in the record. In such a circumstance, we will not disturb the findings made by the trier of fact. Thus, this aspect of her argument fails.

The remainder of Tang's arguments focus on alleged misrepresentations by Fought. There is evidence that inaccurate or, perhaps, accurate but misleading information about rent rolls and the connected income stream was provided to the lender or to the appraiser. The evidence also shows that the information was actually provided by the seller or by the seller's employees and routed through Fought to the lender and appraiser. There is also testimony attempting to explain how this occurred, and there is some evidence to suggest that the information was largely correct as of the month of the sale (although the data was somewhat incomplete because it did not include information about the previous years' revenue or occupancy). There was evidence of occupancy at the time of the purchase that indicates that the occupancy level was quite high, but it is also apparent that this circumstance changed shortly thereafter as "signup specials" expired. There is some evidence that recently evicted residents had been allowed to reoccupy apartments as well. There is some evidence that could be understood to reflect that although the results were misleading, the facts were actually either exactly as advertised or substantially so. Although it would be specious to say that this is merely a misunderstanding, the result is also reflective of the absence of any external effort by Tang to obtain information from outside, unrelated sources that did not have an agenda.

The evidence shows Tang believed that Fought, who was a salesman hired by the seller and whose compensation would be derived solely from a commission on the sale of the property, was working for her best interest rather than in the best interests of his principal and of his own wallet. Unfortunately for Tang, this was not a judicious belief for her to adopt. Again, there is evidence which could be understood in different ways. There is some evidence that Fought

made misrepresentations (about the condition of the property and the level of occupancy) or only partial disclosures or that he was less than cautious about assuring the veracity of those representations. However, there is also some evidence that Fought was unaware of the condition of parts of the property, and there is evidence that the occupancy levels (although only temporary and due to some extraordinary measures of which he was aware) were as he had represented to Tang. In addition, though the term "material" is not defined for the jury, his behavior, though unfortunate, is to some degree predictable for some types of real estate salespeople. Because Tang had the ability to conduct an independent review and seek her own information, a jury might have concluded that any misstatements or silence by Fought were not material. Under this state of the facts, it does not appear that Tang proved so conclusively that Fought had committed fraud as to allow this Court to undo a jury verdict.

## IV.     THE SECOND JURY CHARGE ON FRAUD

The jury charge had a second instruction relating to fraud which defined it as follows:

Fraud occurs when—

   a.     a party fails to disclose a material fact within the knowledge of that party, and
   b.     the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth, and
   c.     the party intends to induce the other party to take some action by failing to disclose the fact, and
   d.     the other party suffers injury as a result of acting without knowledge of the undisclosed fact.

At first glance, one might assume that Fought's partial disclosures of fact to Tang would fit neatly into the definition above as supplied in the jury instruction. After that first glance, one would need to take the phrase "and does not have an equal opportunity to discover the truth" into

17

account. It is quite apparent that Tang made no effort to make an independent investigation to determine the physical condition of the property, the value of the apartment complex, the circumstances of the occupancy levels, or other pertinent factors she should have taken into account when making the decision to purchase. A jury, looking at the conduct of Tang, could easily have determined that she failed to take the relatively easy steps that would have been required to discover facts that would have been discouraging to the decision to purchase. Accordingly, the jury could well have determined that Tang had not been the subject of fraud. This being the case, it is the duty of this Court to respect the jury's verdict.

## V.    THE CONTRACT CLAIM

The jury was also charged on a contract/agency claim against Fought, UVP, and Wong and the other individuals who were the principals of UVP. That aspect of Tang's claims on appeal consists of only two pages of briefing. The contention by Tang is that the evidence conclusively shows that the sales contract required Fought, UVP, and Wong to provide (among many other things) copies of the actual leases of the tenants and signed "estoppel certificates" from each tenant; it is undisputed that Tang was not supplied with these documents.[8]

A condition precedent that is part of a contract is an event that must happen or be performed before a duty of immediate performance of a promise arises. *Hohenberg Bros. Co. v. George E. Gibbons & Co.*, 537 S.W.2d 1, 3 (Tex. 1976). Under one type of condition precedent to an obligation to perform are those acts or events that must occur after the making of a contract

---

[8]The active date for production is five days after the "effective date," the date the escrow agent acknowledges receipt of the contract. The last page of the contract has a box where this information is supposed to be provided. Predictably, it is blank. Since there was a closing of the transaction and there was an escrow agent involved, we presume that the escrow agent received a copy of the contract at some point in time before the closing.

18

but before there is a right to immediate performance and before there is a breach of contractual duties. *Id.* The obligations of UVP to provide the documents before closing appear to be conditions precedent to the obligation of Tang to complete the purchase.

However, it also appears that Tang chose to provide the purchase price and close the sale despite the failure to provide this information. She was certainly entitled to the documents per the contract, but chose to proceed without them. The jury question as requested by Tang and submitted to the jury asked, "Did any of those named below fail to comply with their respective agreements with Virginia Oak Venture, LLC and/or Jane Tang?"

Tang then requested affirmative or negative responses as to Fought, Wong and the other principals of UVP, and UVP itself. The jury answered "No" as to each of these parties. Technically, the initial question is whether the jury found that a breach of the contract had taken place. "The essential elements of a breach of contract claim are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Valero Mktg. & Supply Co. v. Kalama Int'l*, 51 S.W.3d 345, 351 (Tex. App.—Houston [1st Dist.] 2001, no pet.).

Tang briefs two matters related to this issue. She contends that the contract conclusively shows that UVP was absolutely required to provide the copies of leases and signed estoppel certificates and that this was never done. This appears to be correct. The jury made a finding that UVP (and the others who were not given summary judgments) did not fail in a duty to carry through with the obligations under the contract. Tang argues that this finding is against the great

weight and preponderance of the evidence. Under the very restrictive terms of the questions submitted to the jury, we find this argument to be somewhat persuasive.[9]

The original answer filed by counsel on behalf of UVP included a claim of the affirmative defenses of waiver and estoppel. Waiver is an "'intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right.'" *Moayedi v. Interstate 35/Chisam Rd., L.P.*, 438 S.W.3d 1 (Tex. 2014) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). "A condition precedent may be waived." *Sun Exploration & Production Co. v. Benton*, 728 S.W.2d 35, 37 (Tex. 1987). "The waiver of a condition precedent may be inferred from a party's conduct." *Id.* "Because waiver is largely a matter of intent, for implied waiver to be found through a party's actions, intent clearly must be demonstrated by the surrounding facts and circumstances." *Aguiar v. Segal*, 167 S.W.3d 443, 451 (Tex. App.—Houston [14th Dist.] 2005, pet. denied).

The unquestioned and uncontroverted evidence in this case is that the items were to be delivered to Tang well before closing. It is equally clear that Tang chose to close on the purchase of the property despite their absence, even though she had to be well aware that they had not been delivered to her. Other than the general claims of injury that were brought about by her decision to complete the purchase, there are also no separate allegations of injury or damages from the failure to deliver these specific items.

---

[9]Since neither Fought, nor Wong, nor any of the other principals of UVP signed the contract in their individual capacities as sellers, the jury correctly responded in the negative as to these persons. In other words, since none of them was individually obligated under the contract, none of them breached the contract.

20

The evidence allows only the conclusion that Tang elected to proceed without the documents. In such a situation, she has waived any right to complain of their absence. Accordingly, even though the jury's "No" answer to the question of whether UVP had not fully performed under the contract was itself unsupportable, the conclusive proof of the affirmative defense in avoidance of the claim is of such a nature as to make the error harmless.

The second matter Tang briefs is the failure by Fought and UVP to pay anything under a separate addendum, one to which she refers as the "95% rent guaranty." That description is not accurate. The contract contains this addendum:

> United Venture Partners & O.D. Fought agree to guarantee that Virginia Oaks Apartments have a 95% occupancy level at the end of each month from 8/07 to 1/08. The buyer agrees to maintain the existing management during this period unless a change in managment [sic] is proven to be needed by their mismanagement.

There is certainly a vast difference between a guarantee of occupancy and a guarantee of rentals. This is simply not a rent guarantee, as is shown by its clear language. Evidence that either UVP or Fought failed to pay rental amounts does not show a violation of this provision. To that extent, her argument is not persuasive.

## VI. WONG AND UVP

Tang also contends that Wong (and vicariously, through him, UVP) committed fraud against her and that the jury's "No" finding on this issue was also made against the great weight and preponderance of the evidence. This issue is difficult to fairly address. Wong/UVP had filed pro se answers and made no appearance at trial. Each time an issue arose that appeared damaging, Fought pointed at the empty chairs that could have been occupied by Wong and UVP.

21

The evidence does show that Wong and UVP did provide documents, in the context of the purchase, and information that was then transmitted to Tang by Fought (agent for the sellers). The real problem, however, is acknowledged in Tang's brief, wherein it claims that many of the misrepresentations were made to the lender and the appraiser—not to Tang—because Wong knew that Tang was relying on the actions of the lender and the opinion of the appraiser in making the final decision regarding purchase. Therefore, although the documents were transmitted with the purpose (and eventual effect) of inducing the plaintiffs to purchase at a grossly inflated price, the representations were not made directly to Tang.

Despite the contentions in Tang's brief, the evidence does not bear out Tang's contention that she relied on the data furnished by Wong in her decision to purchase. First, even though Tang now disparages the fact that Wong failed to disclose that he had purchased the same property only a year before the sale for a much lower price, the resale of property at an increased price is not a wrongful act. Second, the evidence does not show that Tang relied directly on the appraisal in making the decision to purchase; that reliance on the (nonexistent) appraisal was made by the lender. The third part is the most directly questionable one. The information provided by Wong to Fought about the rentals, both percentage of properties occupied and the income therefrom, was information provided to Tang shortly before closing and was of obvious concern to her.

Tang was not shown the "appraisal"[10] before contracting to purchase the property or before the final closing. Her argument is instead that she relied on the value as should have been set out in a proper appraisal which she believed was to be provided to her lender as an antecedent to its decision to loan the balance of the purchase price of the property. Thus, because the appraisal was unprofessionally done, the lender was misled and approved a loan for Tang that was wholly unsupportable with revenue from the purchased property. Although this reeks of collusion, it does not prove anything more than sloppy procedure and foolish decisions by the lender. Had the lender actually lost money due to an unprofessional and inaccurate appraisal, it might well have a cause of action against an appraiser who delivered such a flawed appraisal. In this circumstance (ignoring the fact that there was no actual final appraisal delivered), the lender did not lose money due to the inaccuracy of the appraisal. Rather, Arbor immediately sold the loan to FNMA, which absorbed the loss after the foreclosure. The loan itself was sought by Tang and provided for her. The choice was ultimately hers, and if the choice was a bad one, the error is also hers. At most, the lender and the appraiser facilitated Tang's bad choice.

## VII.   THE "GUARANTY"

At the time of closing, there was a scramble orchestrated by Fought to obtain an agreement from Wong about a guarantee to Tang. Tang testified that she demanded (and believed that she had received) a guarantee of a certain level of rental income for a period of five months. Under the terms of the guarantee as she testified she believed she had received, if there were any shortfall in that guaranteed revenue, the difference between the guaranteed rental and

---

[10]One needs to remember that there was never an actual appraisal provided to anyone but, rather, an unsigned draft of one that was given to the lender.

the actual rentals received would be paid by Wong. However, according to Fought, Wong refused that request and agreed, instead, to provide a guarantee of a certain level of occupancy.

The document actually cited by Tang as being the one upon which she relied is not ambiguous. Rather than being a rental guarantee, it is a guarantee of a certain level of occupancy. It was not signed by Wong but, rather, by Fought—on behalf of both parties. According to Tang, Wong delivered only one check to her pursuant to that agreement and that check was dishonored. Except for the testimony of Tang, there is no evidence of the amount due under the guarantee (whatever it is).

Even so, the guarantee did not induce Tang to close the purchase because it was not delivered as a condition precedent to closing. It was not signed until after the closing had taken place. Further, the guarantee as written is unequivocal. It guarantees only the level of occupancy and not any level of income; it does not provide for any damages if the level of occupancy does not meet the guarantee. Tang could not recover under that guarantee.

## VIII. RENT ROLLS

At oral argument, it became clear that Tang was relying heavily on the rent rolls provided to her as proof of fraud. Although Tang testified that Wong provided inaccurate information to her and Arbor about three unspecified months of rent rolls, we do not find information in the record to support that claim.

Taking Tang's uncontroverted testimony at face value, it is apparent that she relied on either the April/May/June or the May/June/July rent rolls, as showing that occupancy was

increasing and was in the ninety-percent range at the end of the rehabilitation of the apartments. The evidence collected by Arbor indicates that this is exactly what was happening.

There is no evidence concerning the other individual defendants at all. Tang has made no effort to suggest any way in which they might be found to have committed fraud, and none is apparent from the record.

In this state of the record, it does not appear that Tang successfully proved her case as a matter of law against Fought, Sheri Diaz, or the other defendants not previously granted summary judgment. The findings of the jury were not against the great weight and preponderance of the evidence. We, therefore, affirm the judgment as to these defendants.

## IX.  CLAIM OF JURY CHARGE ERROR

Tang contends that the trial court erred by failing to present a charge to the jury for fraud as to Diaz. Tang asked to have the same jury questions on fraud purportedly committed by Fought submitted regarding the actions of Diaz. The trial court refused to do so. The trial court is to submit questions raised by the written pleadings and the evidence. TEX. R. CIV. P. 278; *Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex. 1992). In considering a claim of charge error, we review the pleadings, evidence, and the entirety of the charge. *Island Recreational Dev. Corp v. Republic of Tex. Savs. Assn.*, 710 S.W.2d 551, 555 (Tex. 1986). The trial court reasoned that all of the evidence presented showed that Diaz was not part of the activities leading up to the purchase. She neither met with nor had any discussions with Tang before Tang's purchase of the property. Accordingly, Tang could not have relied on any statements Diaz made while settling

25

on the decision to purchase. Therefore, the court reasoned, an issue involving Diaz was improper.

In addition, although Tang alleges that Diaz prepared falsified documents, there is no evidence that Diaz in fact did prepare them. However, a rent roll dated August 2, 2007, just prior to closing, was signed by Diaz, and showed forty-four occupied units. Tang argues that this rent roll differs critically from a different statement prepared by UVP. This is an inaccurate statement. Plaintiffs' Exhibit 16 contains only a rent roll for the month of July 2007. Whereas, Plaintiffs' Exhibit 79 contains a rent roll with monthly rental income for January 2006 through May, 2007. They do not overlap. In other words, the second exhibit does not support Tang's allegation that the first exhibit is either fraudulent or incomplete. In the absence of proof that Diaz took fraudulent action before the purchase, the decision of the court not to submit an issue concerning her finds support in the record. Error has not been shown with regard to the refusal of the trial court to submit the requested instructions pertaining to Diaz.

In summation, we affirm the judgment of the trial court in favor of Lander Kyle Lewallen, Butler Burgher Group, LLC, Arbor Commercial Funding, LLC, the Federal National Mortgage Association, O.D. Fought, Jr., Sheri Diaz, United Venture Partners, LLC, Chris Wong, Raymond He, Joyce He, and Biyou Lao.

We find that the trial court erred in awarding judgment for attorney fees to Arbor Commercial Funding, LLC, and reverse the judgment of the trial court in its favor and render a take-nothing judgment to the extent that it awarded attorney fees to Arbor against Tang.

26

As noted before, only if Fought had been found liable to Tang would the Michael Group have been vicariously liable to Tang. At the time the trial court granted summary judgment in favor of the Michael Group, questions of fact existed which, if answered in favor of Tang and against Fought, would have subjected the Michael Group to liability. Because of this, we found that the trial court erred in the grant of a summary judgment on behalf of the Michael Group against Tang. However, because the jury found that Fought was not liable to Tang (a finding which we affirm in this appeal), the Michael Group was likewise not liable. As a result of the jury's findings concerning Fought, no harm resulted to Tang in the trial court's grant of summary judgment in favor of the Michael Group.

Accordingly, we also affirm the trial court's take-nothing judgment in Tang's action against the Michael Group.

Bailey C. Moseley
Justice

Date Submitted:     September 11, 2014
Date Decided:       October 30, 2014

27