**Opinion issued October 18, 2018**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-16-00414-CV

———————————

**MOSAIC RESIDENTIAL NORTH CONDOMINIUM ASSOCIATION, INC.,**
**Appellant**

**V.**

**5925 ALMEDA NORTH TOWER, L.P., 5925 ALMEDA NORTH TOWER, G.P., L.L.C., J.E. DUNN CONSTRUCTION COMPANY, AND ELMORE INTERESTS, INC. D/B/A, ADMIRAL GLASS & MIRROR, Appellees**

---

**On Appeal from the 333rd District Court**
**Harris County, Texas**
**Trial Court Case No. 2014-61804**

---

## MEMORANDUM OPINION

Appellant, Mosaic Residential North Condominium Association, Inc. (the

"Association"), challenges the trial court's summary judgment rendered in favor of

appellees, 5925 Almeda North Tower, L.P., 5925 Almeda North Tower, G.P., L.L.C. (collectively, "Almeda"), J.E. Dunn Construction Company ("Dunn"), and Elmore Interests, Inc., doing business as Admiral Glass & Mirror ("Admiral"), in the Association's lawsuit against appellees for negligence and against Almeda for negligent misrepresentation, breach of implied warranty, breach of fiduciary duty, and violations of the Texas Deceptive Trade Practices Act ("DTPA").[1] In its sole issue, the Association contends that the trial court erred in granting a summary judgment dismissing its lawsuit on the ground that it lacked standing to assert its claims. The Association asserts, "alternatively," that genuine issues of material fact preclude summary judgment on appellees' limitations defense.

We affirm.

**Background**

Mosaic on Hermann Park (the "Master Condominium") is a high-rise, multi-residential and retail development overlooking Hermann Park in Houston. It consists of two 23-story residential towers, north and south, situated on a common podium. The 6-story podium houses a retail component and parking. This lawsuit concerns alleged construction defects in the windows or window systems in the north residential tower (the "North Tower") and resulting damage from water intrusion into some of its approximately 394 condominium units.

---

[1]    *See* TEX. BUS. & COM. CODE ANN. §§ 17.46, 17.50 (West 2011 & Supp. 2018).

2

In July 2007, Almeda, the project developer, declared the Master Condominium as a mixed-use condominium regime, as defined by the Texas Uniform Condominium Act ("UCA"),[2] by recording a "Declaration of Condominium for Mosaic Master Condominium" (the "Master Declaration"). The Master Bylaws provided for the appointment of the Mosaic Master Condominium Association (the "Master Association"). The terms of the Master Declaration define the rights and responsibilities of the Master Association; define the units, components, common elements, and boundaries in the Master Condominium; govern repairs and maintenance by the Master Association and the owners; and allocate liability and expenses.

In December 2007, Dunn, the general contractor, completed construction of the North Tower. To govern the North Tower, Almeda recorded the "Declaration of Condominium for Mosaic Residential North Condominium" (the "North Declaration"). And, the North Declaration provided for the creation of appellant, the Association.[3] Pursuant to the UCA, the "membership of the association at all times consists exclusively of all the unit owners" (the "owners" or "members").[4] The terms of the North Declaration, which state that they are subject to those in the

---

[2]    *See* TEX. PROP. CODE ANN. ch. 82 (West 2014 & Supp. 2018).

[3]    The Association asserts that it is a non-profit corporation created under the UCA. *See* TEX. PROP. CODE ANN. § 82.101 (West 2014).

[4]    *See id.*

3

Master Declaration, define the rights and responsibilities of the Association; define the boundaries of the condominium units ("unit(s)") and the common elements ("common elements"); govern repairs and maintenance of the North Tower by the unit owners and the Association; and allocate liabilities and expenses.

As pertinent here, the exterior of the North Tower consists of concrete panels, stucco plaster, a "glazed window wall system" or "window system," involving over 1,200 aluminum-framed windows, and sliding glass patio doors at balconies. In 2008, water leaks, or water intrusion around the windows or window systems, was reported in approximately nine of the condominium units in the North Tower. The unit owners filed insurance claims and hired contractors to perform repairs.

In 2012, water leaks occurred in some of the units on the east end of the North Tower. The Association called Admiral, the original window subcontractor and installer, who performed repairs. In October 2012, after repairs were unsuccessful, the Association retained an engineer, Jeff Garrison, to investigate the water intrusion issues. In April 2013, Garrison concluded, based on his investigation, that the leaks were isolated. However, later in 2013, the Association again contacted Garrison, reporting that water leaks had occurred in additional units on the north, south, and west sides of the North Tower. After his investigation, Garrison concluded that there were project-wide construction defects in window installations, resulting in water intrusion and damage in some units. From July 2013 to October 2013, the

4

Association paid $27,294.05 to Admiral, and others, for "maintenance and repairs to the exterior windows and window system" in approximately 20 units.

On October 22, 2014, the Association sued Almeda, Dunn, and Admiral for negligence and sued Almeda for negligent misrepresentation, breach of implied warranty, breach of fiduciary duty, and violations of the DTPA. In its petition, the Association, noting that it is "comprised of and represents all of the owners of the individual condominium units at [the North Tower] . . . , pursuant to the UCA," stated that it brought its suit "on its own behalf and on behalf of its Members."

In its petition, the Association asserted: "The Association is suffering from various construction deficiencies affecting the [North Tower]":

A. EXTERIOR CLADDING WINDOWS

All window systems were defectively installed, fabricated, designed, sealed and flashed. This includes but is not limited to defective and negligent installation of internal and external flashing, window head end caps, weep holes and dams, sealant transitions within the exterior cladding, and window framing seals. This defective construction and installation has resulted in water intrusion at all the window systems which has caused damage to other building materials such as drywall, framing, sheathing and building materials.

B. INTERIORS

As a result of the improper construction of the buildings at the [North Tower], there are fractures, separations in the interior walls/ceilings, flooring, damage to floor trim as well as water damage within the unit affecting the floor and wall components.

In its negligence claim against appellees, the Association asserted that each had breached its duty to "design, supervise, improve, construct, market sell, and/or

5

repair the [North Tower] in a reasonable and non-negligent manner, including but not limited to designing, supervising, improving, constructing, marketing, selling, and/or repairing the [North Tower] in accordance with all plans, specifications, . . . building codes, [and] industry standards." And, appellees breached their duty to ensure that all construction was designed and performed in a good and workmanlike manner.

The Association alleged that Almeda made false representations "to the Association and/or its Members," i.e., that "the units and common elements" were built in a good and workmanlike manner and were free from defects, on which they had reasonably relied to their detriment. The Association also alleged that Almeda breached implied warranties "to the Association and/or its Members" that the North Tower was of habitable quality throughout, built in accordance with applicable building codes, and built and repaired in good and workmanlike manner. The Association further alleged that Almeda breached its fiduciary duties to "the Association as well as its Members" by failing to control and supervise the construction of the North Tower; failing to "construct the [North Tower] in accordance with all applicable plans, specifications, . . . building codes, [and] industry standards"; failing to "properly advise the Association of construction deficiencies," and failing to "adequately repair construction deficiencies." It

6

asserted that Almeda's misrepresentations, breaches of implied warranties, and nondisclosures constituted violations of various provisions of the DTPA.

The Association sought to "recover the cost to repair construction defects and resulting damages to the [North Tower]," mental anguish damages, exemplary damages, attorney's fees and costs.

The Association asserted that it had standing to bring its claims, pursuant to Texas Property Code section 82.102(a)(4), which provides, in pertinent part:

(a)    Unless otherwise provided by the declaration, the association, acting through its board, may:

. . . .

(4)    institute, defend, intervene in, settle, or compromise litigation or administrative proceedings in its own name on behalf of itself or two or more unit owners on matters affecting the condominium;[5]

Dunn filed a motion for summary judgment, in which Almeda and Admiral joined, arguing that section 82.102(a)(4) did not confer standing on the Association to bring its claims because the statute expressly excepts any actions prohibited by a condominium's declaration. And, here, the North Declaration prohibits the Association from bringing claims based on alleged defects in the condominium units or common elements, as follows:

---

5    TEX. PROP. CODE ANN. § 82.102(a)(4).

All Owners hereby acknowledge and agree that the Association shall not be entitled to institute any legal action on behalf of any or all of the Owners which is based on any alleged defect in any Unit or the Common Elements, or any damage allegedly sustained by any Owner by reason thereof, but rather, all such actions shall be instituted by the Person(s) owning such Units or served by such Common Elements or allegedly sustaining such damage.

Appellees also asserted that the Association lacked common law standing because it did not own, and had no interest in, the units or common areas, and thus the Association suffered no injury from the alleged construction defects. Further, appellees asserted, the Association lacked associational standing because the North Declaration expressly prohibits the Association from suing on behalf of its members for construction defects in units and common areas and because it sought money damages that varied with each member. Appellees attached, as their summary judgment evidence, the Master Declaration and North Declaration.

In its response to the motion for summary judgment, the Association asserted that section 19(e) "does not purport to deprive [it] of its own independent standing for claims brought on the Association's behalf." Rather, it "only purports to apply to claims brought on behalf of "any or all of the Owners." The Association argued that the exception in section 82.102(a) should not be interpreted to preclude its standing because such interpretation "would allow the developer of property to completely undermine the functioning of a homeowner's association by permitting a declarant to unilaterally abrogate all of an association's statutory rights." The

8

Association asserted that the "better reading" is that the exception "clarifies that the rights conferred by Section 82.102 are not exhaustive, and that the declaration may confer additional rights on a homeowner's association." Further, the UCA prohibits a contractual waiver of "UCA rights."

The Association also argued that it has common law standing because it is "aggrieved by the defects in the window system." It asserts that it is responsible, under the North Declaration, for the maintenance and repairs of the "portions of the [North Tower] where the defects at issue exist," namely, the "exterior windows, window systems, window framing, and resulting interior damages." The Association asserted that it had already incurred "at least $27,294.05 in repair damages."

The Association further argued that it has associational standing because the unit owners have standing to sue in their own right; its suit is germane to its purpose because it was formed for the enforcement of the North Declaration and is responsible for the maintenance and repair of the building exterior and window system; and the participation of its members is not necessary because any award of damages "will go to the Association, not to the unit owners."

The Association attached, as its summary-judgment evidence, its Second Amended Petition; the North Declaration; the affidavit of Andree Boudreaux, a member of the Association's board of directors, who testified that, from 2013 to 2015, the Association had "incurred expenses of at least $27,294.05 related to

9

maintenance and repairs to the exterior windows and window system"; and the 2013 through 2015 repair invoices.

After a hearing, the trial court granted appellees' motion for summary judgment and dismissed the Association's lawsuit for lack of standing.

Although appellees also moved for summary judgment asserting that the Association had filed its claims after the expiration of the limitations period, the trial court, having dismissed the Association's lawsuit based on standing, i.e., lack of subject matter jurisdiction, did not reach appellees' motion for summary judgment based on their limitations defense.

## Summary Judgment

In its sole issue, the Association argues that the trial court erred in granting summary judgment dismissing its claims because it had standing to pursue its claims "under statutes that apply to condominiums and homeowners associations"; as an "aggrieved party" under the common law; and "under the doctrine of associational standing."

### A.    Standard of Review and Legal Principles

We review a trial court's summary judgment de novo.[6]  *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Provident Life & Accident Ins.*

---

[6]    Although, typically, a challenge to standing is raised in a plea to the jurisdiction, the Texas Supreme Court, and this Court, have concluded that matters concerning subject-matter jurisdiction, such as standing, may be raised in a motion for summary

10

*Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). In conducting our review, we take as true all evidence favorable to the non-movant, and we indulge every reasonable inference and resolve any doubts in the non-movant's favor. *Valence Operating*, 164 S.W.3d at 661; *Knott*, 128 S.W.3d at 215. When, as here, a trial court grants summary judgment without specifying the grounds for granting the motion, we must uphold the judgment if any of the asserted grounds are meritorious. *Beverick v. Koch Power, Inc.*, 186 S.W.3d 145, 148 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).

To prevail on a traditional motion for summary judgment,[7] the movant must establish that no genuine issue of material fact exists and that it is entitled to

---

judgment. *See Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000); *Green Tree Servicing, LLC v. Woods*, 388 S.W.3d 785, 792 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

[7] Appellees' motions do not specify whether they sought summary judgment on traditional or no-evidence grounds. *Compare* TEX. R. CIV. P. 166a(c) *with* TEX. R. CIV. P. 166a(i). Ordinarily, because the two forms of summary judgment are distinct and invoke different standards of review, we must make an initial determination regarding which type of summary judgment was filed before we can reach the merits of the trial court's ruling. *See Phillips v. Am. Elastomer Prod., L.L.C.*, 316 S.W.3d 181, 185 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). When, as here, a motion does not clearly and unambiguously state that it is being filed under rule 166a(i), the nonmovant has no notice that the movant is seeking a no-evidence summary judgment, and we construe such motion as a traditional motion under rule 166a(c). *Id.* Further, this Court, and others, have held that subject matter jurisdiction cannot be challenged in a no-evidence motion for summary judgment. *See Green Tree Servicing, LLC*, 388 S.W.3d at 792–94; *see also Thornton v. Ne. Harris Cty. MUD 1*, 447 S.W.3d 23, 39 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (accord). Thus, we construe appellees' motion as seeking summary judgment on traditional grounds under rule 166a(c). *See* TEX. R. CIV. P. 166a(c).

11

judgment as a matter of law. *See* TEX. R. CIV. P. 166a(c); *KPMG Peat Marwick v. Harrison Cty. Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1999). When a defendant moves for summary judgment, it must either (1) disprove at least one essential element of the plaintiff's cause of action or (2) plead and conclusively establish each essential element of its affirmative defense, thereby defeating the plaintiff's cause of action. *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995); *Shanklin v. Bassoe Offshore (USA) Inc.*, 415 S.W.3d 311, 316 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). Once the movant produces sufficient evidence to establish its right to judgment, the burden shifts to the nonmovant to come forward with competent controverting evidence to raise a fact issue. *See Van v. Pena*, 990 S.W.2d 751, 753 (Tex. 1999). A genuine issue of material fact arises if reasonable and fair-minded factfinders could differ in their conclusions in light of all of the summary-judgment evidence. *See Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007).

Standing is implicit in the concept of subject matter jurisdiction, and subject matter jurisdiction is essential to the authority of a court to decide a case. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443 (Tex. 1993). Standing is never presumed, cannot be waived, and may be raised for the first time on appeal. *Id.* at 443–44. We review standing under the same standard by which we review subject matter jurisdiction generally. *Id.* at 446. We look to the facts alleged in the petition,

12

but may consider other evidence in the record if necessary to resolve the question of standing. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000). The standing inquiry "requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." *Heckman v. Williamson Cty.*, 369 S.W.3d 137, 153, 156 (Tex. 2012) (holding that courts "must assess standing plaintiff by plaintiff, claim by claim"). "[A] plaintiff who has been subject to injurious conduct of one kind [does not] possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject." *Id*. at 153 (internal quotations omitted) (noting, "[S]tanding is not dispensed in gross."). A plaintiff's lack of standing to bring some, but not all, of his claims deprives the court of jurisdiction over those discrete claims. *Id*. at 145. If the plaintiff lacks standing to bring all of his claims, the court must dismiss the whole action for want of jurisdiction. *Id*. at 150–51.

Standing to sue may be predicated upon either statutory or common law authority. *See Williams v. Lara*, 52 S.W.3d 171, 178–79 (Tex. 2001); *David Powers Homes, Inc. v. M.L. Rendleman Co*., 355 S.W.3d 327, 334 (Tex. App.—Houston [1st Dist.] 2011, no pet.). When standing has been statutorily conferred, the common law rules governing standing do not apply. *Williams*, 52 S.W.3d at 178.

**B.     Analysis**

Here, the Association asserts that it has (1) statutory standing; (2) common law standing; and (3) associational standing to bring its claims.

**1.     *Statutory Standing***

The Association asserts that it has standing, pursuant to Property Code section 82.102(a)(4), to bring its claims on behalf of itself and on behalf of the unit owners. *See* TEX. PROP. CODE ANN. § 82.102(a)(4) (West 2014).   It asserts that, notwithstanding the exception in section 82.102(a), its "rights should not be abrogated" by the terms of the North Declaration because such interpretation "contravene[s] the legislative intent and the model act on which the statutes are based."  The Association also asserts that it has standing, pursuant to Property Code section 202.004, to bring its claims.  *See* TEX. PROP. CODE ANN. § 202.004 (West 2014).

In statutory-standing cases, we analyze the construction of the relevant statute to determine upon whom the Texas Legislature conferred standing and whether the claimant in question falls within that category. *See Tex. Dep't of Protective and Regulatory Servs. v. Sherry*, 46 S.W.3d 857, 859–61 (Tex. 2001).  We review the trial court's interpretation of a statute de novo.  *See Johnson v. City of Fort Worth*, 774 S.W.2d 653, 655–56 (Tex. 1989).  Our primary objective is to effectuate the legislature's intent.  *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625 (Tex. 2008).

14

We ascertain intent by first looking to the plain and common meaning of the words used in the statute. *Id.* at 625–26. We rely on the plain meaning of the text, unless a different meaning is supplied by legislative definition or is apparent from the context, or unless such a construction leads to absurd results. *Id.*; *see also* TEX. GOV'T CODE ANN. § 311.011 (West 2013). We view terms in context to give them full effect. *State v. Gonzalez*, 82 S.W.3d 322, 327 (Tex. 2002); *Tex. Mut. Ins. Co. v. Sonic Sys. Int'l, Inc.*, 214 S.W.3d 469, 476 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). And, we presume that the legislature intended a just and reasonable result. *City of Rockwall*, 246 S.W.3d at 626.

Similarly, we interpret declarations governing condominiums in accordance with the rules governing contract interpretation. *AMI Ass'n Mgmt., Inc. v. Sprecher*, No. 01-15-00791-CV, 2017 WL 3526762, at *4 (Tex. App.—Houston [1st Dist.] Aug. 17, 2017, no pet.) (mem. op.) (construing UCA and terms of declaration); *see also* TEX. PROP. CODE ANN. § 81.002(5) (defining "declaration" as "the instrument that establishes property under a condominium regime"); *Bundren v. Holly Oaks Townhomes Ass'n, Inc.*, 347 S.W.3d 421, 435 (Tex. App.—Dallas 2011, pet. denied) (applying rules of contract interpretation to condominium declaration); *Aghili v. Banks*, 63 S.W.3d 812, 816 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).

In construing a written contract, our objective is to ascertain the true intent as expressed in the plain language used in the instrument. *Great Am. Ins. Co. v. Primo*,

15

512 S.W.3d 890, 893 (Tex. 2017); *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). We assign terms their ordinary and generally accepted meaning unless the contract directs otherwise. *Great Am. Ins. Co.*, 512 S.W.3d at 893. We consider the entire writing, giving effect to all of its provisions so that none will be rendered meaningless. *Coker*, 650 S.W.2d at 393. Generally, we construe contracts "from a utilitarian standpoint bearing in mind the particular business activity sought to be served" and "will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive." *Frost Nat'l Bank v. L&F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (internal quotations omitted). "[U]nder general rules of construction we avoid strictly construing an instrument's language if it would lead to absurd results." *Kourosh Hemyari v. Stephens*, 355 S.W.3d 623, 626–27 (Tex. 2011); *see Elgohary v. Lakes on Eldridge N. Cmty. Ass'n, Inc.*, No. 01-14-00216-CV, 2016 WL 4374918, at *8 (Tex. App.—Houston [1st Dist.] Aug. 16, 2016, no pet.) (mem. op.).

In their motion for summary judgment, appellees argued that section 82.102(a)(4) does not confer standing on the Association to bring its claims because the statute expressly excepts any actions prohibited by a condominium's declaration. And, the North Declaration prohibits the Association from bringing claims based on alleged defects in the condominium units or common elements.

Section 82.102(a)(4) confers standing on a condominium owners' association as follows, in pertinent part:

> (b)  *Unless otherwise provided by the declaration, the association*, acting through its board, *may*:
>
> . . . .
>
> (4)  *institute*, defend, intervene in, settle, or compromise *litigation* or administrative proceedings in its own name on behalf of itself or two or more unit owners on matters affecting the condominium[.]

TEX. PROP. CODE ANN. § 82.102(a)(4) (emphasis added).  Thus, the statute generally authorizes an association to institute litigation on behalf of itself or two or more unit owners on matters affecting the condominium, *unless the declaration provides otherwise*.  *See id.*; *Nat'l Liab. & Fire Ins. Co.*, 15 S.W.3d at 527 (holding that we ascertain intent by first looking at plain and common meaning of statute's words).

Here, section 19(e) of the North Declaration provides:

> All Owners hereby acknowledge and agree that the Association *shall not* be entitled to institute *any legal action* on behalf of *any or all of the Owners* which is *based on any alleged defect* in *any Unit or the Common Elements*, or *any damage allegedly sustained by any Owner* by reason thereof, but rather, *all such actions* shall be instituted by the Person(s) owning such Units or served by such Common Elements or allegedly sustaining such damage.

(Emphasis added.)   Thus, by exception authorized in section 82.102, the North Declaration expressly prohibits the Association from instituting "any legal action" "based on any alleged defect" in "any Unit or the Common Elements" on behalf of

17

"any or all of the Owners." *See id.* Rather, such actions may only be brought by the persons owning such units, served by such common elements, or "actually sustaining" such damage.

Appellees first asserted that the Association's claims are all "based on" alleged construction defects. The evidence shows that the Association asserted claims for negligence, negligent misrepresentation, breach of fiduciary duty, breach of implied warranty, and violations of the DTPA. Through the various iterations in its petition, the Association's claims, in substance, are that one or more appellees breached a duty to ensure that all construction in the North Tower was designed and performed in a good and workmanlike manner, was of habitable quality, and was free from defects, including, but not limited to, designing, supervising, improving, constructing, marketing, selling, and/or repairing the North Tower in accordance with all plans, specifications, building codes, and industry standards. Thus, the Association's claims, in substance, are all based on alleged defects.

Appellees next asserted that these claims allege defects in the units or the common elements. The evidence shows that the Association, in its petition, seeks damages for "the cost to repair construction defects and resulting damages," based on:

A.   EXTERIOR CLADDING WINDOWS

All window systems were defectively installed, fabricated, designed, sealed and flashed. This includes but it not limited to defective and

negligent installation of internal and external flashing, window head end caps, weep holes and dams, sealant transitions within the exterior cladding, and window framing seals. This defective construction and installation has resulted in water intrusion at all the window systems which has caused damage to other building materials such as drywall, framing, sheathing and building materials.

B.    INTERIORS

As a result of the improper construction of the buildings at the Project, there are fractures, separations in the interior walls/ceilings, flooring, damage to floor trim as well as water damage within the unit affecting the floor and wall components.

Thus, the Association alleges construction defects in the "exterior windows" and "window systems." It seeks damages for the resulting water intrusion affecting the drywall, framing, and sheathing, and the interior walls, ceilings, and floors "within the unit[s]."

The North Declaration defines the term "unit" as:

that portion of the condominium intended for individual ownership and use as more particularly described in this declaration and shall include the undivided ownership of the Common Elements allocated to the Unit by this Declaration.

The North Declaration, at section 4(a), provides that each unit consists of a dwelling and its appurtenant percentage of undivided interest in the common elements. The owners have title to their units in fee simple and to the common elements as tenants-in-common. Section 4, provides that, "[n]otwithstanding anything contained herein and/or in the Plats to the contrary, the Unit boundaries of a Unit shall be as provided in this section 4." Pertinent here is that section 4(a) states: "The vertical boundaries

19

[of a Unit] include the wallboard, *the glass wall system*, *or other material comprising the walls of the Unit*." (Emphasis added.) Section 4(c) includes: "Entry doors and *exterior glass surfaces*, including but not limited to, *windows and glass doors*, serving the Unit *shall be included within the boundaries of the Unit*." (Emphasis added.) Thus, the Association's alleged construction defects in the "exterior windows" and "window systems" allege defects in the units.

The "Common Elements," defined in the North Declaration at section 5, consist of "all portions of the Condominium not located within the boundaries of a Unit, and all Master Limited Common Elements." The Common Elements include:

> [c]ertain utility infrastructures; lobby; business center; conference rooms and offices; swimming pool; fitness center; club room; corridors; mail area; elevator lobbies; elevators; elevator shafts; stairs; electrical rooms; telephone room; trash chute; roof; exterior walls of the Condominium building; and all other lighting, equipment and furniture in any Common Element of the Condominium building.

Nothing in the definition of the common elements expressly includes windows or window systems. Although the common elements include the "exterior walls of the Condominium building," they do not include those portions located within the boundaries of a Unit, which, as discussed above, includes the "glass wall system."

The Limited Common Elements, defined in the Master Declaration, section 6, as including parking spaces, canopies, awnings, fencing, and mechanical and electrical equipment, are not implicated here.

20

Thus, the Association's alleged construction defects in the windows, "exterior windows," and "window systems" constitute claims alleging defects in the units. Even were we to conclude that portions of the glass wall system lie outside the units, the North Declaration defines the common elements as consisting of "all portions of the Condominium not located within the boundaries of a Unit." Thus, any such claim would necessarily allege a defect in a common element. And, section 19(e) prohibits claims based on any alleged defect in "any Unit or the Common Elements."

Appellees further asserted that the Association is barred under section 19(e) from bringing its claims on behalf of any or all of the members and that it is likewise barred from bringing the same prohibited suit "on behalf of itself."

In its petition, the Association states that it brings its suit "on its own behalf and on behalf of its Members."

To the extent that the Association brings its claims for defects in the units or common elements "on behalf of its Members," the plain language of section 19(e) prohibits the Association from instituting "any legal action" "based on any alleged defect in any Unit or the Common Elements," on behalf of "any or all of the Owners." The North Declaration defines the Association's "members" as the unit "owners." Thus, such suit is expressly prohibited by section 19(e) and the Association lacks standing under section 82.102(a)(4) to bring its claims.

21

To the extent that the Association brings its claims for defects in the units or common elements "on its own behalf," its standing is likewise precluded. The Association asserts in its petition that it is "comprised of and represents all of the owners of the individual condominium units at [the North Tower] ("Members"), pursuant to the UCA." The UCA provides, in pertinent part, that "[t]he membership of the association at all times consists *exclusively* of *all the unit owners*." TEX. PROP. CODE ANN. § 82.101 (West 2014) (emphasis added). We concluded above that the expressed intent of the North Declaration was to prohibit the Association from instituting "any legal action" "based on any alleged defect" in "any Unit or the Common Elements" on behalf of "any *or all of the Owners*" because all such actions are to be reserved to the persons owning such units, served by such common elements, or "actually sustaining" such damage. (Emphasis added.) To also construe the North Declaration in a manner that grants the Association, which "exclusively" consists of "all the unit owners," standing to bring such suits "on its own behalf" would render section 19(e) meaningless. *See Coker*, 650 S.W.2d at 393 (holding that we consider "the entire writing in an effort to give effect to all the provisions of the contract so that none will be rendered meaningless"). Such interpretation would allow the Association to simply institute any legal action for defects in units "on its own behalf." We will not interpret an instrument in a manner that produces an absurd result. *See Kourosh Hemyari*, 355 S.W.3d at 626–27

22

("[U]nder general rules of construction we avoid strictly construing an instrument's language if it would lead to absurd results."); *Elgohary*, 2016 WL 4374918, at *8.

We conclude that the summary-judgment evidence establishes that the Association does not have standing under Property Code section 82.102(a)(4) to assert its claims against appellees. Having concluded that appellees established their right to summary judgment, the burden switched to the Association to present competent controverting evidence raising a fact issue. *See Van*, 990 S.W.2d at 753.

In its summary-judgment response, the Association, in arguing that genuine issues of material fact preclude summary judgment, raised various public policy arguments against the exception in Property Code 82.102(a)(4). It asserts that interpreting the statutory exception as not authorizing it to bring its claims "would allow the developer of property to completely undermine the functioning of a homeowner's association by permitting [the developer] to unilaterally abrogate all of an association's statutory rights." The Association asserted that it is "similarly inappropriate for the declarant to control an association's standing though the terms of a declaration it has drafted" because Property Code section 82.004 prohibits a contractual waiver of "UCA rights."

"[T]he State's public policy is reflected in its statutes." *Tex. Commerce Bank, N.A. v. Grizzle*, 96 S.W.3d 240, 250 (Tex. 2002). "It is not this court's office to choose between competing policies addressed by the legislature's chosen language."

23

*In re S.A.M.*, 321 S.W.3d 785, 792 (Tex. App.—Houston [14th Dist.] 2010, no pet.); *see also In re Tex. Dep't of Family and Protective Servs*., 210 S.W.3d 609, 614 (Tex. 2006). In construing a statute, we presume that the legislature "acted with knowledge of the background law and with reference to it." *City of Round Rock v. Rodriguez*, 399 S.W.3d 130, 137 (Tex. 2013). The Association does not identify any irregularity that would justify reexamination of the legislature's decision to limit the powers granted in section 82.102. *See Primo v. Garza*, No. 01-14-00480-CV, 2015 WL 777999, at *2 (Tex. App.—Houston [1st Dist.] Feb. 24, 2015, no pet.) (mem. op.) (declining to reexamine scope of authority granted by legislature in section 82.102). Here, under the legislature's statutory regime, a condominium association generally has standing to institute litigation, unless to do so would conflict with the condominium's declaration. *See* TEX. PROP. CODE ANN. § 82.102(a)(4). We apply the statute as written. *See In re S.A.M.*, 321 S.W.3d at 792.

In support of its argument that it has standing to sue under section 82.102, the Association, in its summary-judgment response and on appeal, relies on *Phan v. Addison Spectrum, L.P*., 244 S.W.3d 892 (Tex. App.—Dallas 2008, no pet.). In *Phan*, the court held that the condominium association, pursuant to section 82.102, had standing to institute suit and to settle claims in its own name and on Phan's behalf. *Id.* at 897. There, however, the exception in section 82.102, which drives our analysis in the instant case, was not raised. *See id.* at 895–97.

24

The Association also argues, as it did in its summary-judgment response, that standing to bring its claims is conferred by Property Code section 202.004. *See* TEX. PROP. CODE ANN. § 202.004. Property Code chapter 202 governs restrictive covenants. *See* TEX. PROP. CODE ANN. ch. 202 (West 2014). Section 202.004, "Enforcement of Restrictive Covenants," provides that a property owners' association may initiate litigation "affecting the enforcement of a restrictive covenant or the protection, preservation, or operation of the property covered by the dedicatory instrument." *Id*. § 202.004. Section 202.004 is not applicable to the issue presented in the instant case, i.e., whether the Association has standing to institute litigation for construction defects, which is governed by section 82.102. *See id*. § 82.102.

The Association does not direct us to any evidence that raises a fact issue regarding its statutory standing. *See Valence Operating*, 164 S.W.3d at 661; *Provident Life & Accident Ins*., 128 S.W.3d at 215. Accordingly, we hold that the trial court did not err in granting appellees summary judgment on this ground.

**2.    *Common Law Standing***

The Association next asserts that it has common law standing to bring its claims based on its maintenance and repair obligations under the North Declaration.

To establish common law standing, a plaintiff must show both that it has suffered a distinct injury and that there is a real controversy between the parties that

the judicial declaration sought will actually resolve. *Brown v. Todd*, 53 S.W.3d 297, 305 (Tex. 2001). Standing generally requires that the plaintiff have suffered an "injury in fact," that is, "an invasion of a legally protected interest that is concrete and particularized, and that is actual or imminent rather than conjectural or hypothetical." *Save Our Springs All., Inc. v. City of Dripping Springs*, 304 S.W.3d 871, 878 (Tex. App.—Austin 2010, pet. denied); *see DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 304–05 (Tex. 2008). A plaintiff has standing when it is personally aggrieved, regardless of whether it is acting with legal authority. *Nootsie, Ltd. v. Williamson Cty. Appraisal Dist.*, 925 S.W.2d 659, 661 (Tex. 1996).

Appellees, in their motion for summary judgment, argued that the Association lacks common law standing to assert its claims because the evidence, i.e., the North Declaration, establishes that the exterior windows and sliding doors, which the Association asserts are defective and require replacement, are within the boundaries of each unit and that the owners are responsible for their maintenance and repair. Similarly, the damages asserted involve the interiors of individual units. Nothing in the North Declaration defines window frames as common elements. Appellees asserted that the North Declaration, section 17, which defines the Association's maintenance and repair responsibilities, imposes on the Association only a limited duty to paint and clean. And, nothing in section 17 obligates the Association to repair, remove, or globally replace windows or window systems.

26

The summary-judgment evidence, i.e., the North Declaration, section 17(a), "Maintenance Responsibility," provides as follows:

> Each Owner shall have the obligation to maintain and keep in good repair all portions of his or her own Unit . . . except any portion of a Unit which is expressly made the maintenance obligation of the Association as set forth in subparagraph (b) below.  This maintenance responsibility shall include, but not be limited to the following:  the exterior glass surfaces located adjacent to a Limited Common Element balcony or terrace, *windows, window frames* (except for *periodic painting, staining, and/or cleaning* of the exterior window frames performed by the Association);  . . . all doors, doorways, door frames, and hardware that are part of the entry system of the Unit (except for *periodic painting, staining, and/or cleaning* of the exterior surface of the entry doors and doorframes) . . . .

(Emphasis added.)  Section 17(b) defines the Association's maintenance and repair responsibilities, as follows:

> The Association shall maintain and keep in good repair as a Common Expense the "Area of Common Responsibility," which includes the following:
>
> i. all Common Elements, including any Limited Common Elements . . . ;
>
> ii. *periodic* painting, staining and/or cleaning of exterior surfaces of the Condominium building, exterior window frames, and entry doors and door frames . . . ;
>
> iii. *periodic* cleaning and maintenance of the exterior glass surfaces (excluding the glass surfaces located adjacent to the Limited Common Element balcony or terrace) . . . [.]

(Emphasis added.)   Thus, under section 17(a), the unit owners are required to maintain and keep in good repair all portions of his or her own unit, except any portion "expressly made the obligation of the Association."  As discussed above,

27

included within the boundaries of the units are the glass wall system, exterior glass surfaces, windows, window frames, glass doors, and door frames. The unit owners' duties are subject to the Association's responsibility for "periodic" painting, staining, and cleaning.

Under section 17(b)(i), the Association is also required to maintain and repair "all common elements." The "Common Elements," defined in the North Declaration at section 5, consist of "all portions of the Condominium *not located within the boundaries of a Unit*, and all Master Limited Common Elements."[8] The common elements include:

> [c]ertain utility infrastructures; lobby; business center; conference rooms and offices; swimming pool; fitness center; club room; corridors; mail area; elevator lobbies; elevators; elevator shafts; stairs; electrical rooms; telephone room; trash chute; roof; exterior walls of the Condominium building; and all other lighting, equipment and furniture in any Common Element of the Condominium building.

(Emphasis added.) The definition of common elements does not expressly include windows or window systems. Although the common elements generally include the "exterior walls of the Condominium building," they do not include portions of the condominium specifically "located within the boundaries of a Unit," i.e., windows and window systems, discussed above.

---

[8] The Master Declaration, section 6, defines the Limited Common Elements as including, with respect to those allocated to the North Residential Component: parking spaces, canopies, awnings, fencing, and mechanical and electrical equipment.

28

The Association's maintenance and repair obligations at section 17(b)(ii) and (iii), with respect to exterior surfaces, window frames, exterior glass surfaces, and entry doors, are expressly limited to "periodic painting, staining and/or cleaning" and "periodic cleaning and maintenance of the exterior glass." Nothing in the term "periodic," i.e., routine, maintenance invokes a duty to perform an expansive replacement of window systems or to repair water damage on the interiors of individual units. *See Italian Cowboys Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 343 (Tex. 2011) (holding that "the responsibility to repair does not properly include the responsibility to completely re-work a system that was structurally defective").

Because appellees produced evidence establishing, as a matter of law, their right to summary judgment, the Association had the burden to come forward with competent controverting evidence raising a fact issue. *See Van*, 990 S.W.2d at 753.

The Association argued in its summary-judgment response that it is "aggrieved by the defects in the window system" because it is responsible under the North Declaration for its maintenance and repair. It points to section 17(b) of the North Declaration, discussed above. Again, nothing in section 17(b) creates a duty on the part of the Association to perform an expansive replacement of window systems or to repair water damage on the interiors of individual units. *See id.*

29

The Association seems to argue that it has standing simply because, notwithstanding whether it has any such duty under the North Declaration, it has already performed certain repairs or replacements.  The Association does not direct us to authority supporting such proposition.  Further, standing cannot be conferred by agreement.  *See Tex. Ass'n of Bus.*, 852 S.W.2d at 445–46; *Green Tree Servicing, LLC v. Woods,* 388 S.W.3d 785, 790 (Tex. App.—Houston 1st Dist. 2012, no pet).

The Association does not direct us to any evidence that raises a fact issue regarding its standing based on maintenance and repair obligations under the North Declaration.  *See Valence Operating*, 164 S.W.3d at 661; *Provident Life & Accident Ins.*, 128 S.W.3d at 215.

Accordingly, we hold that the trial court did not err in granting appellees summary judgment on this ground.

### 3.    *Associational Standing*

Finally, the Association asserted that it has standing to sue as an association acting on behalf its members.

Under the common law doctrine of associational standing, an association may sue on behalf of its members if: (1) its members would otherwise have standing to sue, (2) the association seeks to protect interests that are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.  *S. Tex. Water Auth. v. Lomas*, 223 S.W.3d 304,

30

308 (Tex. 2007); *Tex. Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 518 (Tex. 1995). The first prong may be satisfied if at least one of the organization's members would have standing individually. *See Hays Cty. v. Hays Cty. Water Planning P'ship*, 106 S.W.3d 349, 357 (Tex. App.—Austin 2003, no pet.). The Supreme Court has observed that the "irreducible constitutional minimum" of individual standing requires that the plaintiff have suffered an "injury in fact," i.e., an invasion of a legally protected interest that is concrete and particularized and that is actual or imminent, rather than conjectural or hypothetical; that the injury be fairly traceable to the challenged action of the defendant and not the independent action of a third party not before the court; and that it be likely that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S. Ct. 2130, 2136 (1992); *Save Our Springs All., Inc.*, 304 S.W.3d at 878; *see also Brown v. Todd*, 53 S.W.3d 297, 305 (Tex. 2001) ("[W]e may look to the similar federal standing requirements for guidance.").

To satisfy the second prong for associational standing, the interest that is "germane to the organization's purpose" must also relate to the interest by which its members would have standing to sue in their own right. *Save Our Springs All., Inc.*, 304 S.W.3d at 886; *see, e.g.*, *Hays Cty.*, 106 S.W.3d at 357 (stating that association was created to address "these kinds of community issues" by which its members showed standing to sue on their own behalf).

31

With respect to the third prong, the Texas Supreme Court has held that whether an association has standing to invoke the court's remedial powers on behalf of its individual members depends substantially on the nature of the relief sought. *Tex. Ass'n of Bus*., 852 S.W.2d at 448; *Tex. Mun. League Intergovernmental Risk Pool v. Burns*, 209 S.W.3d 806, 815 (Tex. App.—Fort Worth 2006, no pet.); *see also Hunt v. Wa. State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S. Ct. 2434, 2441 (1977). If the association seeks a declaration, injunction, or some other form of prospective relief, "it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured," and the third prong of this test is satisfied. *Tex. Ass'n of Bus*., 852 S.W.2d at 448 (quoting *Hunt*, 432 U.S. at 343, 97 S. Ct. at 2441) (holding that association satisfied third prong because it sought only prospective relief, raised only issues of law, and did not need to prove the individual circumstances of its members to obtain that relief); *see also Hunt*, 432 U.S. at 344, 97 S. Ct. at 2442 (recognizing that neither the commission's "interstate commerce claim nor [its] request for declaratory and injunctive relief require[d] individualized proof and both [were] thus properly resolved in a group context"); *Stop the Ordinances Please v. City of New Braunfels*, 306 S.W.3d 919, 931–32 (Tex. App.—Austin 2010, no pet.) (holding claims did not require participation of individual members because plaintiff sought only prospective declaratory and injunctive relief, raised only questions of law, and was

not required to prove the individual circumstances of its members to obtain relief, i.e., the members sought the same relief); *Wilchester W. Concerned Homeowners LDEF, Inc. v. Wilchester W. Fund*, *Inc.*, 177 S.W.3d 552, 561 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (holding that homeowners' association was not required to prove individual circumstances of its members to obtain relief because it sought declaratory relief to collectively and equally benefit its injured members). Under such circumstances, prudential concerns are advanced because the court can assume that the remedy sought, if granted, will inure to the benefit of those members of the association actually injured. *Tex. Ass'n of Bus.*, 852 S.W.2d at 448; *see also Warth v. Seldin*, 422 U.S. 490, 515, 95 S. Ct. 2197, 2213 (1975) ("[I]n all cases in which we have expressly recognized standing in associations to represent their members, the relief sought has been of this kind.").

However, if the association seeks damages on behalf of its members or must otherwise prove the members' individual circumstances in order to obtain relief, participation of the individual members is required, and the third prong is not satisfied. *Tex. Ass'n of Bus.*, 852 S.W.2d at 446–47 (holding that "an organization should *not* be allowed to sue on behalf of its members . . . when the members seek to recover money damages and the amount of damages varies with each member." (emphasis added)); *Burns*, 209 S.W.3d at 815; *see, e.g.*, *Warth*, 422 U.S. at 515–16, 95 S. Ct. at 2214 (holding that association of construction firms lacked standing to

33

sue for damages for lost profits of its members because "whatever injury may have been suffered is peculiar to the individual member concerned, and both the fact and extent of injury would require individualized proof").

Here, appellees, in their motion for summary judgment, argued that the Association lacked associational standing because the second and third prongs of the test are not satisfied. *See S. Tex. Water Auth.*, 223 S.W.3d at 308. Because we conclude that the third prong is not satisfied, we need not resolve the second.

The Association, in its petition, seeks to "recover the cost to repair construction defects and resulting damages to the [North Tower]"; "three times the amount of its economic and mental anguish damages"; and exemplary damages. Thus, the Association does not seek a declaration, injunction, or other relief on behalf of its members in general. Rather, it seeks money damages for alleged construction defects and for water intrusion affecting the interiors of some units.

The summary-judgment evidence shows that the residential portion of the North Tower is a 23-story building, containing approximately 394 condominium units. Each unit is owned in fee simple by an individual member. The size of each unit varies from 672 to 5,654 square feet, and the number of exterior walls and windows also varies. Thus, the amount of damages will vary with the square footage of each unit, the number of windows in the unit, the number of windows or window systems actually defective, and the amount of damage to the interior of the affected

34

units. The record shows that the Association asserts that it has paid "in excess of $27,000" for repairs and "will incur as much as $9,773,762."

When, as here, money damages are sought that will vary with each member, the Texas Supreme Court has held that "an organization should *not* be allowed to sue on behalf of its members." *See Tex. Ass'n of Bus*., 852 S.W.2d at 446–47 (emphasis added). Because the relief that the Association seeks necessitates that each member prove his distinct injury, the Association lacks associational standing to assert its claims. *See id.* at 448; *see also Warth*, 422 U.S. at 515–16, 95 S. Ct. at 2214 (holding that because "whatever injury may have been suffered is peculiar to the individual member concerned, and both the fact and extent of injury would require individualized proof," association lacks associational standing to sue for such damages).

Because appellees established that the Association lacks associational standing to bring its claims, the burden switched to the Association to bring forth evidence to raise a fact issue precluding summary judgment. *See Van*, 990 S.W.2d at 753.

In its summary-judgment response, the Association argues, with respect to the third element, that there is no need for individualized proof of the damages to its members because "any award of damages will go to the Association, not to the individual unit owners." Again, prudential concerns are advanced only when the

35

remedy sought, if granted, will inure to the benefit of those members of the association who are actually injured. *See Tex. Ass'n of Bus.*, 852 S.W.2d at 448.

In support of its argument, the Association relies on *Concerned Owners of Thistle Hill Estates Phase I, LLC v. Ryan Road Management*, No. 02-12-00483-CV, 2014 WL 1389541, at *3–6 (Tex. App.—Fort Worth Apr. 10, 2014, no pet.) (mem. op.), and *Anderson v. New Property Owners' Association of Newport, Inc.*, 122 S.W.3d 378, 384–86 (Tex. App.—Texarkana 2003, pet. denied). In *Thistle Hill*, however, unlike in the instant case, the association "pleaded a declaratory judgment cause of action, and the relief sought was limited to prospective relief that benefited all of its members." 2014 WL 1389541, at *6. Similarly, in *Anderson*, a property owners' association sought an injunction to enforce its deed restrictions against a homeowner. 122 S.W.3d at 385. The court of appeals concluded that the association had associational standing to sue because it sought injunctive relief that would inure to the benefit of all of its members. *Id.* In the instant case, the Association seeks money damages to redress alleged property injuries. Thus, the Association's authority does not support its argument.

The Association does not direct us to evidence that raises a fact issue regarding its associational standing. *See Valence Operating*, 164 S.W.3d at 661; *Provident Life & Accident Ins.*, 128 S.W.3d at 215. Accordingly, we hold that the trial court did not err in granting appellees summary judgment on this ground.

36

In sum, because the Association's summary-judgment evidence does not raise a fact issue with respect to its standing, on either statutory or common law grounds, we conclude that appellees have conclusively established that the Association lacks standing to bring its claims. Accordingly, we hold that the trial court did not err in granting summary judgment dismissing the Association's claims against appellees.

Having concluded that the Association lacks standing to assert its claims, we do not reach whether it brought its claims prior to the expiration of the limitations period.

## Conclusion

We affirm the trial court's judgment.

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Higley and Bland.